UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT L. "ROBB" PITTS, et al.,

Petitioners,

v.

UNITED STATES OF AMERICA,

Respondent.

CIVIL ACTION NO.
1:26-CV-00809-JPB

## **ORDER**

This matter is before the Court on Petitioners'[1] Amended Motion for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g) [Doc. 30]. The United States of America ("Respondent") opposes the motion. This Court finds as follows:

## **PROCEDURAL HISTORY**

On January 28, 2026, after obtaining a search warrant signed by a United States Magistrate Judge (hereinafter, the "Magistrate Judge"), the Federal Bureau of Investigation ("FBI") seized over 600 boxes of Fulton County's 2020 election records. Soon after, on February 5, 2026, Petitioners filed an Emergency Motion

---

[1] Petitioners are Robert L. "Robb" Pitts, who is the Chairman of the Fulton County Board of Commissioners; the Fulton County Board of Registration and Elections; Fulton County, Georgia; and Che Alexander, the Clerk of Court for Fulton County.

for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g). [Doc. 1]. Petitioners amended their motion on February 17, 2026. [Doc. 30]. After briefing closed and the parties attempted to mediate their dispute, the Court held an evidentiary hearing on March 27, 2026. Thereafter, Petitioners filed a Post-Hearing Motion for Additional Evidence. [Doc. 71]. Although the Court denied Petitioners' motion, which sought to compel Respondent to answer certain questions and separately requested documents for an *in camera* review, the Court determined that if Petitioners obtained additional evidence, they could submit it to the Court no later than April 27, 2026. [Doc. 88, p. 4]. Petitioners timely submitted additional evidence. [Doc. 98].

In addition to submitting additional evidence, Petitioners filed a Motion to Compel, which this Court granted in part. [Doc. 89]; [Doc. 100]. The parties filed supplemental briefing on May 5, 2026. [Doc. 105]; [Doc. 106]. With evidence now closed and briefing complete, Petitioners' Amended Motion for Return of Property is now ripe for review.

## FACTS

After considering the parties' submissions and the entirety of the evidence, the Court sets forth the following facts, which relate to: (A) the 2020 election in Fulton County; (B) current litigation involving the 2020 election records; (C) the

2

FBI's seizure of the election records; and (D) pertinent testimony from the evidentiary hearing.

### A. The 2020 Election in Fulton County

#### i. Voting

In 2020, Fulton County voters could vote either absentee or in person. Given the COVID-19 pandemic that was still affecting the country at the time, many Fulton County voters chose to vote absentee.  To vote absentee, a person had to request an absentee ballot prior to the election.  The Secretary of State then sent the voter a blank absentee ballot and two return envelopes.  [Doc. 22-2, p. 16]. Once the voter filled out the ballot and placed it in the provided envelopes, the voter would return the ballot either by leaving it in a designated drop box or by mailing it.  Id.  Because absentee ballots were placed in envelopes, they were typically folded.

Voters who did not vote absentee could vote in-person during the early-voting period or on Election Day.  These voters cast their ballots on voting machines.  After a voter made his or her selections using the machine's electronic interface, the machine would print a filled-in paper ballot with a QR code indicating the voter's selections.  Id. at 12.

Completed ballots—whether cast in-person or absentee—were electronically counted and recorded using tabulator machines.  Relevant here, tabulator machines capture two types of digital records when scanning ballots.  See [Doc. 76, p. 108].  The first record is a "cast vote record," which is the actual recording of a voter's selections that is ultimately used to tabulate the results for the election.  Id.  The second is a picture of the front and back of the ballot known as a "ballot image."  Id.  Ballot images are not ballots and are not used to tabulate the results of the election, but they are often retained as a form of receipt.  [Doc. 22-2, p. 11].

In addition to capturing the digital records, tabulator machines contain a memory card that stores information about the scanned ballots, including the total number of votes cast for each candidate on that particular machine.  Id. at 13; [Doc. 76, p. 125].  The tabulator machines also have a protective counter, which logs the total number of ballots recorded on an individual tabulator machine during the machine's lifetime—similar to how an odometer keeps track of the total number of miles driven on a car.  [Doc. 22-2, p. 15].  At the end of the voting period, poll workers generate tabulator tapes from the tabulator machines.  Ga. Comp. R. & Regs. § 183-1-12-.12(a)(1).  A tabulator tape documents the number on a tabulator machine's protective counter (as explained above, the total number of ballots scanned by that tabulator machine during its lifetime) and the number of

4

votes cast on that machine for each individual candidate.  Tabulator tapes serve as a "paper back-up to the memory cards that store the ballot tabulation and are not part of the process by which official results are reported by counties to the Secretary of State."  [Doc. 85-5, p. 9].  Under Georgia law, the tabulator tapes must be signed by the poll manager and two poll-officer witnesses.  [Doc. 22-2, p. 14]; Ga. Comp. R. & Regs. § 183-1-12-.12(a)(1).

### ii. *Counting the Votes*

After the polls closed on Election Day, Fulton County began counting the ballots.  In 2020, as summarized in Figure 1 below, three separate counts occurred before the results were certified.  [Doc. 22-2, p. 7 n.1].  The first count (the "Original Count") began immediately after the polls closed and was completed the following day. Id.  Fulton County used tabulator machines during the Original Count to keep track of the votes electronically.  [Doc. 76, p. 116].

After the Original Count, Fulton County conducted a second count (the "Risk Limiting Audit").  [Doc. 22-2, p. 7 n.1].  "[V]oters and members of the public" performed the Risk Limiting Audit by hand-counting the ballots.  [Doc. 76, p. 116].  The purpose of the Risk Limiting Audit was to "detect or determine whether or not there [was] sufficient evidence that the outcome [of the Original

Count was] incorrect." Id.[2]  Because the purpose of the Risk Limiting Audit was to determine whether there was confidence in the Original Count, the results of the Risk Limiting Audit were not certified, nor were they a precise count.  Id. at 116–17; [Doc. 85-3, p. 4].

In early December 2020, a third count (the "Recount") of the ballots occurred.  Like the Original Count, the Recount utilized tabulator machines to electronically scan the ballots.  [Doc. 22-2, p. 15].  Ultimately, the results produced in the Recount were certified as the official election results for the 2020 Fulton County general election.  [Doc. 76, p. 117]; O.C.G.A. § 21-2-495.

| November 2020 Election — Fulton County Ballot Counts | | |
|---|---|---|
| **Name** | **Method** | **Dates** |
| Original Count | Tabulator machines (electronic) | November 3–4, 2020 |
| Risk Limiting Audit | Hand count | Mid-November 2020 |
| Recount | Tabulator machines (electronic) | December 2020 |

Figure 1:  Election Counts

---

[2] Though a standard risk limiting audit would only include a hand count of a "small sample of ballots" to verify election results, all the ballots were counted during the 2020 Risk Limiting Audit "due to the closeness of the race." [Doc. 22-2, p. 16].

6

### iii. *Investigations and Reports Concerning the 2020 Election*

Given the closeness of the 2020 election and concerns by some that it was not conducted in a fair manner, there were multiple investigations into Fulton County's election processes. Following these investigations, Seven Hills Strategies, LLC, the Fulton County Performance Review Board and the Secretary of State issued reports. The reports are discussed below.

The Georgia State Election Board ("SEB") contracted with Seven Hills Strategies to serve as an independent, non-partisan monitor for the 2020 election in Fulton County. [Doc. 22-2, p. 20]. In its report, Seven Hills Strategies identified several problems with the election, like the "extremely sloppy" absentee ballot counting process. [Doc. 85-7, p. 2]. While the report acknowledged that the election was not perfect, the report noted that there were no indications of "dishonesty, fraud, or intentional malfeasance" by any Fulton County election officials. Id. at 1.

In 2023, the Fulton County Performance Review Board[3] issued a report concerning elections in Fulton County. In its report, the Performance Review

---

[3] At the request of the Georgia General Assembly, the SEB appointed the Performance Review Board in August of 2021. [Doc. 22-2, p. 21]. The Performance Review Board was tasked with "mak[ing] a thorough and complete investigation . . . regarding the technical competency in the maintenance and operation of election equipment, proper

7

Board summarized previous investigations into the 2020 election and agreed with the Seven Hills Strategies report that there were no indications of fraud, dishonesty or intentional malfeasance by election officials.  [Doc. 85-6, pp. 8–10].  The report also stated that elections conducted in 2021 and 2022, which are not an issue here, ran smoother than the one that occurred in 2020.  Id. at 11–20.

The Secretary of State issued reports in 2022, 2023 and 2024.  These reports addressed specific complaints about the 2020 election.  The first report, released in 2022, discussed the Risk Limiting Audit.  [Doc. 85-3].  The report recognized that irregularities occurred with the Risk Limiting Audit and determined that they were caused by human error and issues with Fulton County's data reporting.  Id. at 15–19.  The 2023 report addressed allegations of mishandled ballots and found that there were no violations of the law.  [Doc. 85-4, pp. 15, 17].  The final report pertained to alleged problems with ballot images and tabulator tapes.  [Doc. 85-5].  As to these problems, the report found that there were possible violations of SEB rules relating to the counting process.  Id. at 11–13.

---

administration and oversight of registration and elections, and compliance with state law and regulations."  O.C.G.A. § 21-2-106(b).

### B.  **Current Litigation Involving the 2020 Election Records**

The 2020 election led to multiple civil lawsuits.  At least two of those suits are still pending, and Petitioners claim that they are relevant here.  The suits are Allen v. State of Georgia, filed in the Superior Court of Fulton County ("the Superior Court Action"), and United States v. Alexander, filed in the United States District Court for the Northern District of Georgia ("the Federal Court Action").  Both actions were stayed after the FBI seized the election records.  The Court discusses the Superior Court Action first.

The Fulton County Board of Registration and Elections ("BRE") filed the Superior Court Action in November 2024 seeking to quash two subpoenas issued by the SEB for the 2020 election materials.  Allen, Civ. A. No. 24CV014632 (Ga. Super. Ct.).  On October 6, 2025, the SEB issued a new subpoena, which the BRE also sought to quash, for "all used and void ballots, stubs of all ballots, signature envelopes, and corresponding envelope digital files from the 2020 General Election in Fulton County."  [Doc. 1-1, p. 8].  The Superior Court denied the motion to quash on December 22, 2025, and ordered the BRE to provide the materials to the SEB upon payment of production costs.  [Doc. 71-4].

The Attorney General of the United States filed the Federal Court Action on December 11, 2025.  In the Federal Court Action, the Attorney General sued Che

9

Alexander (the "Clerk") seeking the same materials that the SEB requested in its October 6, 2025 subpoena.  <u>Alexander</u>, 1:25-CV-07084 (N.D. Ga.), Doc. 1.  The Attorney General sought access to the records via a federal statute that requires custodians of election records to, upon written demand, make their records available for inspection.  <u>See</u> 52 U.S.C. § 20703.  On January 5, 2026, the Clerk filed a motion to dismiss.  <u>Alexander</u>, Doc. 18.

### C.  <u>The FBI's Seizure of the Election Records</u>

The criminal investigation in this case originated with a referral from Kurt Olsen, the presidentially appointed Director of Election Security and Integrity. [Doc. 76, p. 215].  Specifically, no later than 9:03 AM on January 5, 2026, Olsen formally referred the investigation to the FBI.  [Doc. 101, p. 2].  Thomas C. Albus, the United States Attorney for the Eastern District of Missouri and Special Attorney to the Attorney General, received the referral on January 5, 2026.  <u>Id.</u> The next day, the FBI opened an "assessment."  <u>Id.</u>  Shortly thereafter, on January 12, 2026, Special Agent Hugh Raymond Evans ("SA Evans")—an FBI agent assigned to the Public Corruption and Civil Rights Squad—requested that the matter be opened as a full investigation, and his request was approved on January 14, 2026.  <u>Id.</u>  On January 19, 2026, SA Evans began drafting his investigative

10

summary based on witness interviews, which he converted to the format of a search warrant affidavit on January 22, 2026.  Id. at 2–3.

On January 27, 2026, Albus submitted a search warrant application to the Magistrate Judge seeking permission to seize Fulton County's 2020 election records.  [Doc. 82-3].  The Court first discusses the search warrant application before turning to the execution of the search warrant.

### i.  The Search Warrant Application

As part of the search warrant application, SA Evans provided an affidavit for the purpose of establishing probable cause (hereinafter, "the Affidavit").  [Doc. 22-2, pp. 5–23].  The Affidavit stated that the FBI was investigating irregularities in the 2020 election in Fulton County.  The Affidavit specifically focused on missing ballot images, "duplicate ballots," tabulator tapes, "pristine ballots" and issues with the Risk Limiting Audit.  Id. at 7, 13–16.[4]

---

[4] In the Affidavit, SA Evans also noted a problem with the reported Recount numbers. [Doc. 22-2, p. 7].  Specifically, SA Evans stated that: "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling 511,343 ballots, 17,434 ballots fewer than original[ly] counted.  The following day, Fulton County then reported a total of 527,925 ballots counted." Id.  The Affidavit never again mentioned any problem with the number of ballots tallied in the Recount.  While the Affidavit only mentioned this issue in passing, the Court does have concerns that the statement was misleading.  See infra p. 36.

### a. Missing Ballot Images

SA Evans stated in his Affidavit that the FBI was investigating missing ballot images. As noted previously, a ballot image is a digital scan of a voter's completed ballot and is automatically created when a ballot is fed into a tabulator machine. In the Affidavit, SA Evans reported that there were almost 18,000 missing ballot images from the Recount. Id. at 8. According to SA Evans, the Director of Elections for the Georgia Secretary of State told him that "a discrepancy like that would be problematic." Id. at 11. SA Evans also provided information that some of the ballot images appeared to have been modified or manipulated as recently as January 11, 2024. Id. at 10. Although SA Evans did not fully explain the importance of ballot images or the significance of missing ballot images, he did acknowledge that the "images are just duplicates" and that it was only the actual ballots that were counted to determine the winner of a given race. Id. at 11 ("The concern is less about the images and more about the ballots and voter count" and "[w]hen the Secretary of State conducted the recount, they did not focus on the images taken by the scanners. They took the actual ballots that were cast and counted them one by one to come up with the total."). SA Evans further acknowledged that "a possible explanation for missing images was

that they were stored on a memory card and it was not uploaded correctly or became corrupt." Id.

### b. Duplicate Ballots

In the Affidavit, SA Evans indicated that the FBI was investigating duplicate ballots, which were detected by "stray marks or other unique markings on a ballot that would allow it to be uniquely identified." Id. at 12. SA Evans explained that a witness told him that he discovered duplicate ballots in both the Original Count and the Recount. Id. In addition to the duplicate ballots, the witness also informed SA Evans that he found new ballots and test ballots in the Recount that did not appear in the Original Count. Id. In the witness's opinion, the addition of these duplicate or new ballots did not change the outcome of the election[5] but could have been an intentional act to make the Recount match the Original Count. Id. at 12–13. SA Evans noted that, if deliberate, this type of ballot manipulation would be an intentional tabulation of ballots in a false manner in violation of the law. Id. at 13. After detailing these potential concerns regarding duplicate ballots, SA Evans disclosed that the Secretary of State investigated the issue and closed its

---

[5] Indeed, the duplicate ballots appeared to favor Donald Trump. [Doc. 22-2, p. 13] ("[The witness] concluded that what he observed could be intentional but was not partisan" because "by adding the duplicate ballots, Donald Trump received approximately 10% more than his average in Fulton County (40% instead of 30%).").

investigation after learning that the duplicate ballots favored Donald Trump.  Id.

SA Evans further explained that the Fulton County Director of Registration and

Elections "admitted that duplication of ballots 'may have occurred,' but indicated

that, if it did occur, it happened due to human error."  Id.

### c. Tabulator Tapes

SA Evans also included a discussion of tabulator tapes in the Affidavit.  As

previously explained, tabulator machines print tabulator tapes after the polls close

at the end of the voting period.  Tabulator tapes reflect the number of total ballots

scanned on a given tabulator machine as well as the number of votes cast for each

individual candidate on that machine.  Id.  SA Evans explained that he spoke with

a witness who reported that some tabulator tapes from the 2020 election were not

properly signed as required under Georgia law and that this deficiency "impacts

the accountability process."[6]  Id. at 13–14.  The Affidavit also referenced a

December 9, 2025 SEB meeting during which Fulton County stated that tabulator

tapes accounting for 315,000 ballots were not properly signed.  Id. at 16.

According to the Affidavit, Secretary of State Brad Raffensberger told the media

that he considered this error to be an administrative oversight.  Id.

---

[6] That same witness also told SA Evans that the tabulator tapes should match the number of physical ballots scanned by that machine and described tabulator tapes as the "holy grail" for the final count. [Doc. 22-2, p. 14].

With regard to tabulator tapes, SA Evans included several observations from Clay Parikh, a cyber security specialist with experience running security and performance checks on voting equipment and a current Special Government Employee appointed to work for the Executive Branch.  Id. at 14.  After reviewing tabulator tapes that he obtained through an open records request, Parikh suspected that memory cards were removed from some tabulator machines and inserted into other tabulator machines, meaning that certain tabulator machines were used to generate final tabulator tapes reflecting voting data gathered from several different tabulator machines.  Id.  Parikh arrived at this conclusion after determining that closing tabulator tapes from some machines were missing and, of the 138 tabulator tapes reviewed, it appeared that 16 tabulator machines were utilized to produce the tapes for approximately 315,000 ballots.  Id.  For instance, Parikh identified one tabulator machine that was used to generate tabulator tapes for ballots scanned on sixteen total tabulator machines across twelve different locations.  Id.  Presumably, this occurred by taking the memory cards from fifteen different machines and feeding them all into one separate tabulator machine that generated a tabulator tape reflecting data at the end of polling from both that machine and the fifteen other machines.  Id.  Based on the proximity of the times reflected across several tabulator tapes, Parikh further reported that he believed that someone had

15

manipulated the poll-closing and report-printed times on several tabulator tapes. Id.

Parikh also reviewed the protective counter data reflected on the tabulator tapes. Id. at 15. Again, protective counters depict the total number of ballots scanned by a given tabulator machine during the machine's lifetime. Id. Parikh determined that the protective counter numbers on five separate tabulator tapes from the same tabulator machine were identical and that, for some tapes, the ballots-scanned number exceeded the protective counter number. Id. In Parikh's view, this indicated that no ballots were ever actually scanned on these tabulator machines, but rather, the tabulator tapes were printed on the machines by inserting a memory card from a different tabulator machine and printing a tape based on the foreign memory card's data. Id. The Affidavit concluded that "[t]his would have allowed an opportunity for the tabulation to be tampered with." Id.

After his discussion of Parikh's findings and conclusions, SA Evans included in the Affidavit statements from a different witness asserting that the tabulator tapes were not used to determine the final vote. Id. In fact, this witness reported that tabulator tapes from the Original Count were not needed during the Recount because the ballots were re-scanned using a different tabulator machine. Id. According to the witness, the ballots were what mattered. Id.

16

### d. Pristine Ballots

The Affidavit provided that the FBI was investigating "pristine ballots," which SA Evans described as absentee ballots that have "no indications" that they have been "folded and mailed as a typical absentee ballot would." Id. at 16. At the outset, SA Evans explained that an SEB member told him that "there is no reason to have a pristine absentee ballot with no folds." Id. The Affidavit then described claims about pristine ballots made by a 2020 poll manager. Id. at 16–17. This witness stated that, during the Risk Limiting Audit, she saw ballot boxes with broken seals, unfolded ballots and some stacks of ballots that were located outside the view of security cameras. Id. at 17. She described one box in particular that included 110 absentee ballots. Id. According to her, these ballots lacked folds and were "too clean" to be absentee ballots. Id. Additionally, she said that 107 of these pristine ballots were identical—voting for the same candidates in every race. Id. Finally, she thought that these ballots had a different texture from typical ballots. Id.

The Affidavit also mentioned that another witness who assisted with the Risk Limiting Audit likewise remembered the 107 ballots and said that the selections looked like they "had been made with a stamp." Id. This same witness reported that she saw two individuals re-voting ballots printed on a different kind

17

of paper and was told by the then-Director of Elections for the BRE that these individuals were re-voting the ballots because the originals were not accepted by the machine. Id. at 17–18. SA Evans noted in the Affidavit that, under Georgia law, any duplicated ballots of damaged or unscannable original ballots had to be clearly identified as duplicates. Id. at 18.

Additionally, the Affidavit discussed statements from a current Fulton County Commissioner who was a poll worker during the November 2020 election. Id. at 19. This witness was assigned to test ballots on tabulator machines to make sure that the machines were working accurately. Id. While performing these tests, the witness said that she observed stacks of "unsecured" test ballots, "unattended" ballots that had already been cast by voters at early voting locations and the printing of random ballots, even though all the necessary test ballots had already been printed. Id. at 19–20.

While SA Evans detailed the concerns that these witnesses had with pristine ballots, SA Evans explained that the Secretary of State's Election Director did not think that it would be feasible for someone to tamper with absentee ballots due to how many people are in the room and that it would be "barely possible" to do anything on a large scale. Id. at 18. SA Evans also noted that the Election Director told him that "there would be pristine absentee ballots in every election"

18

because the Vote Review Panel would generate a pristine ballot after adjudicating the results of a damaged ballot.  Id. at 19.  SA Evans further reported that the Election Director stated that, if fraudulent absentee ballots were introduced during the reconciliation process without removing real ballots, it would be caught by comparing the total number of ballots to the total number of votes.  Id. at 18.  The Election Director also said that he was not aware of any discrepancies between the voter count and the ballot count.[7]  Id.  Even though the Election Director opined that it would not be feasible to introduce fictitious ballots on a large scale, he did note that there was no way to determine whether someone substituted fictitious ballots for real ballots during the reconciliation process if the voter total and ballot total matched.  Id.  SA Evans further included a statement from an Investigator with the Secretary of State's Office indicating that he did not know how a person could inject fraudulent absentee ballots into the count and, indeed, that a post-election ballot count performed by the Georgia Secretary of State's Office and the Recount performed by Fulton County matched.  Id. at 20.

---

[7] The Affidavit also included statements to the same effect from another witness.  [Doc. 22-2, p. 19].  This witness, an Investigator with the Secretary of State's Office, explained that the provisional ballots available on Election Day were all accounted for.  Id.

19

### e. The Risk Limiting Audit

The Affidavit also raised issues with the Risk Limiting Audit conducted by Fulton County.  As already discussed, the Risk Limiting Audit was not an official recount, but was a tool to verify election results.  SA Evans stated in the Affidavit that a witness identified thirty-six errors within the batch tallies and that these errors included "duplicated or misidentified batch entries and incorrect batch entries reflecting 100% vote for one candidate."[8]  Id. at 8 n.4.  In contrast, SA Evans also included in the Affidavit the statements of one witness who believed that the ballots were all accounted for during the Risk Limiting Audit.  Id. at 15.

SA Evans explained in the Affidavit that reports from Seven Hills Strategies and the Performance Review Board confirmed that there were problems with the Risk Limiting Audit.  Specifically, the Seven Hills Strategies Report stated that "there were chain of custody issues, ballots left unattended, unsealed bags being used, and auditors not recording seal numbers on ballot bags."  Id. at 20.  The Performance Review Board likewise found that there were inaccurate batch tallies.  Id. at 7. SA Evans disclosed in his Affidavit that both reports concluded that there was "no evidence of fraud, dishonesty, or intentional misconduct" with regard to

---

[8] Neither the Affidavit nor the parties explain what batch tallies or batch entries are.

20

the November 2020 election in Fulton County, but rather "persistent

disorganization." Id. at 21.

### f. Other Observations in the Affidavit

In SA Evans's view, the above irregularities, if intentionally caused,

demonstrate violations of 52 U.S.C. § 20701 and 52 U.S.C. § 20511(2)(B).[9] Id. at

22. Section 20701, which is a records-retention statute, provides that "[e]very

officer of election shall retain and preserve, for a period of twenty-two months

from the date of any general, special, or primary election of which candidates for

the office of President . . . are voted for, all records and papers." Put more simply,

the statute requires election officers to retain election records for twenty-two

months. Section 20511(2)(B) states that it is a felony to

> knowingly and willfully deprive[] . . . the residents of a State of a
> fair and impartially conducted election process, by . . . the
> procurement, casting, or tabulation of ballots that are known by
> the person to be materially false, fictitious, or fraudulent under
> the laws of the State in which the election is held.

Essentially, SA Evans stated in his Affidavit that the seizure of the election records

could show that some of them were intentionally destroyed or that the "tabulation

---

[9] SA Evans explained that "[i]f these deficiencies were the result of intentional action, it would be a violation of federal law regardless of whether the failure to retain records or the deprivation of a fair tabulation of a vote was outcome determinative for any particular election or race." [Doc. 22-2, p. 8].

of votes included materially false votes, either through duplicated scanning of specific ballots" or through the "interjection of pristine ballots." [Doc. 22-2, p. 22].

### ii. Execution of the Search Warrant

The Magistrate Judge considered the search warrant application on January 28, 2026, and determined that there was probable cause. Consequently, the Magistrate Judge signed the warrant authorizing the seizure of the election records.[10] Id. at 1. After the warrant was signed, FBI agents executed the warrant and seized over 600 boxes of election records. Following the seizure, both the Superior Court Action[11] and the Federal Court Action were stayed because at least some of the items at issue in those cases were no longer in the Clerk's possession.

---

[10] The Magistrate Judge actually signed two warrants. The Magistrate Judge first authorized the search of the Fulton County Election Hub. [Doc. 22-1, p. 2]. After Respondent discovered that the election records were housed within the Election Hub, but in "an access-limited portion of the warehouse controlled by the Clerk of Court," it requested a second warrant. [Doc. 22-2, p. 22]. The Magistrate Judge then signed a new warrant to specifically authorize the search of "the Clerk of Court's portion of the warehouse." Id. at 2, 22.

[11] Although the judge in the Superior Court Action denied the motion to quash and ordered the Clerk to turn over the records to the SEB, the election records had not yet been produced to the SEB because a cost determination needed to be made.

### D.  **Pertinent Testimony from the Evidentiary Hearing**

The Court conducted an evidentiary hearing on Petitioners' Amended

Motion for Return of Property on March 27, 2026.[12]  At the hearing, Petitioners'

evidence primarily focused on what they perceived to be shortcomings with SA

Evans's Affidavit.  Specifically, Petitioners argued that SA Evans omitted material

facts from the Affidavit that—had they been revealed to the Magistrate Judge—

would have caused her to deny the warrant application.

Petitioners called an expert witness, Ryan Macias, to testify regarding the

Affidavit's alleged deficiencies.[13]  Macias opined that the Affidavit omitted

various innocent explanations for the facts it alleged.  For instance, he asserted that

"pristine" absentee ballots that do not have folds are normal in elections, especially

from military and overseas voters.  [Doc. 76, pp. 113, 118].  As to one witness's

description of ballot image files that were modified after the date of the election,

Macias explained that the Secretary of State's Office might have renamed the

---

[12] The hearing was originally scheduled for the end of February.  [Doc. 26].  After
Respondent filed a motion to both vacate the hearing and to quash a subpoena for SA
Evans's testimony, however, the Court ordered the parties to mediate and continued the
hearing.  [Doc. 49].  Mediation did not result in a complete agreement between the
parties, although Respondent did agree during the mediation to give Petitioners a copy of
the seized documents.

[13] Macias's written declaration was admitted into evidence at the hearing.  [Doc. 85-1].  It
was also attached to Petitioners' Amended Motion.  [Doc. 30-1].  Macias's declaration
provides that he is "an election technology and security expert."  Id. at 1.

ballot image files, which would result in a later modification date. Id. at 112. Macias further testified that multiple legitimate reasons could exist for scanning a ballot more than once. Id. at 114.

In addressing the Affidavit's discussion on tabulator tapes, Macias confirmed that memory cards were taken from some machines and then, after Election Day, input into different tabulator machines to determine the final vote count. Id. at 125–26. Macias explained that this was done specifically with tabulator machines used during early voting so that election officials did not have to send personnel back to each early voting location after the close of voting to retrieve the votes from those machines. Id. at 125. Macias stated that the memory cards were stored "securely" until Election Day and were then used to generate tabulator tapes reflecting each memory card's results after the close of voting. Id. at 125–26. Macias explained that this was done because it is impermissible to begin calculating election results until all votes have been cast and that nothing in this process indicates misconduct. Id. at 126.

Macias also discussed other aspects of the Affidavit. He testified that ballot images and tabulator tapes have no bearing on the election outcome because only ballots are counted in determining the winner of a given race. Id. at 107, 122. He

further testified that the sort of issues identified in the Affidavit occur in virtually every election.  Id. at 105–06.

The facts detailed above provide the context for the issue before the Court— whether Petitioners are entitled to the return of the election records under Federal Rule of Criminal Procedure 41(g).  The Court now turns to the applicable legal standards and analysis.

## DISCUSSION

Petitioners assert that under Federal Rule of Criminal Procedure 41(g), the Court should order the immediate return of the seized property.[14]  Rule 41(g) permits "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return."  Where, as here, a party invokes Rule 41(g) before the initiation of any civil or criminal proceedings, the motion for return of property is treated as a civil action in equity.  Richey v. Smith, 515 F.2d 1239, 1245 (5th Cir. 1975).[15]  Notably, the Eleventh Circuit Court

---

[14] Not only do Petitioners want the return of the election records—they also want Respondent to return any copies, which would effectively enjoin any further criminal investigation.  [Doc. 30, p. 35].

[15] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . handed down by that court prior to the close of business on [September 30, 1981], shall be binding as precedent in the Eleventh Circuit."  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

25

of Appeals has held that a district court should invoke its equitable jurisdiction only under the "narrowest" circumstances and that "[e]xercises of equitable jurisdiction . . . should be exceptional and anomalous." Trump v. United States, 54 F.4th 689, 694, 697 (11th Cir. 2022) (citation modified).  In other words, a district court should show "caution and restraint" before exercising its equitable jurisdiction.  Vasarely v. United States, No. 23-MC-00256, 2025 WL 2624156, at *7 (D.P.R. Sep. 11, 2025) (quoting 3A Wright & Miller's Federal Practice & Procedure § 690 (4th ed. 2008)).  The burden of establishing this "exceptional and anomalous" jurisdiction "rests upon the party asserting jurisdiction." Trump, 54 F.4th at 694, 697 (citation modified).

Courts are required to apply "an exacting test" when deciding whether to exercise equitable jurisdiction over suits flowing from the seizure of property. Id. at 697.  Under this test, courts must consider the four factors set forth in Richey: (1) "whether the government displayed a 'callous disregard' for the plaintiff's constitutional rights"; (2) "whether the plaintiff has an individual interest in and need for the material whose return [it] seeks"; (3) "whether the plaintiff would be irreparably injured by denial of the return of the property"; and (4) "whether the plaintiff has an adequate remedy at law for the redress of [its] grievance." Id. (citation modified).  The purpose of this exacting test is to prevent "unnecessary

[judicial] interference with the executive branch's criminal enforcement authority—while also offering relief in rare instances where a gross constitutional violation would otherwise leave the subject of a search without recourse." Id.

## A. Callous Disregard for Constitutional Rights

As stated above, courts should first consider whether there has been a callous disregard of a movant's constitutional rights. This factor is the most important of the factors. Id. at 698 (stating that the callous disregard factor should be "the 'foremost consideration' for a court when deciding whether it may exercise its equitable jurisdiction" (quoting United States v. Chapman, 559 F.2d 402, 406 (5th Cir. 1977)). Indeed, if the callous disregard factor is not satisfied, "courts will not intervene in an ongoing investigation—and rightly so." Id. Importantly, to "ensure[] that equitable jurisdiction remains extraordinary" and to prevent a "flood of disruptive civil litigation," the callous disregard standard presents a formidable burden to movants. Id. (citation modified); see also Lindell v. United States, 82 F.4th 614, 619 (8th Cir. 2023) (describing callous disregard as an "extraordinarily high hurdle").

Although callous disregard is the most important factor, the Eleventh Circuit has not explicitly defined it.[16] Helpful guideposts have been established, however.

---

[16] The parties have not offered definitions for the term either.

For example, the <u>Richey</u> court suggested that a movant generally cannot establish callous disregard where the government's seizure of the property was pursuant to a search warrant—even when the warrant is "subsequently challenged as invalid." 515 F.2d at 1243 n.8.  Given this guidance, the Eleventh Circuit has recognized that "the vast majority of subjects of a search warrant have not experienced a 'callous disregard' of their constitutional rights."  <u>Trump</u>, 54 F.4th at 698. Importantly, the court has not said that a movant's constitutional rights can *never* be callously disregarded when there is a warrant.  Indeed, it would be error to find that no callous disregard exists merely because there is a warrant.  <u>Harbor Healthcare Sys., L.P. v. United States</u>, 5 F.4th 593, 599 (5th Cir. 2021) (stating that the district court erred by concluding that the government did not callously disregard the plaintiff's rights simply because the government obtained a search warrant).  Although the <u>Richey</u> court suggested that a movant ordinarily does not meet its burden where the government's seizure of property was pursuant to a search warrant, that court did indicate that a movant may be able to establish callous disregard where government agents employ "fraudulent or deceitful methods in order to gain access to a citizen's private papers."  515 F.2d at 1243 n.8.  With these guideposts in mind, the Court analyzes Petitioners' arguments.

Petitioners advance two arguments in support of their contention that callous disregard exists here.  First, Petitioners assert that the Affidavit (a) lacked probable cause and (b) omitted material facts.  Second, Petitioners contend that the manner of the execution of the warrant was unreasonable because it interfered with both state sovereignty and ongoing legal proceedings and was premised upon criminal violations where the statute of limitations had already lapsed.  The Court addresses the arguments below.[17]

### i.  Petitioners' Argument that the Affidavit Lacked Probable Cause and Omitted Material Facts

#### a.  Lack of Probable Cause

The Affidavit used to support the search in this case was eighteen pages long and identified various alleged election deficiencies that the FBI was investigating.  As stated previously, the Affidavit provided that "[i]f" the election deficiencies "were the result of intentional action, it would be a violation of federal law."  [Doc. 22-2, p. 8].  In Petitioners' view, the Affidavit failed to sufficiently allege intent.  Specifically, Petitioners claim that the Affidavit's "hypothetical" does not establish

---

[17] Respondent argues, among other things, that there is no callous disregard because Petitioners—as government entities and individuals suing on behalf of government entities—lack cognizable Fourth Amendment rights.  [Doc. 32, pp. 16–17].  For purposes of adjudicating the instant motion, the Court assumes without deciding that Petitioners can assert constitutional claims.

probable cause and that the Magistrate Judge made a "mistake of law" in finding otherwise.  [Doc. 30, p. 9]; [Doc. 76, p. 203].  Petitioners argue that "the Affidavit does not identify a single piece of evidence from the FBI's investigation establishing probable cause to believe that anyone intentionally, let alone willfully, violated" the law.  [Doc. 30, p. 8] (emphasis omitted).  Ultimately, Petitioners assert that "[i]t is woefully deficient for an affiant to say if I develop additional evidence at some later point in time, the seized property would potentially be evidence of a crime."  Id. at 10 (emphasis omitted).  In response, Respondent primarily asserts that the Affidavit does not need to contain evidence of each element of an offense, including intent, to establish probable cause.[18]  [Doc. 32, pp. 20–22].

The Court disagrees with Petitioners' argument that the Affidavit is "woefully deficient" just because, in their view, allegations of intent are lacking.[19]  Indeed, "an affidavit need not establish every element of a suspected

---

[18] Respondent also argues that there can be no callous disregard when an agent complies with the warrant requirement.  [Doc. 32, pp. 17–18].  While callous disregard is often not found in cases where a warrant is obtained, the presence of a warrant does not categorically prevent a finding of callous disregard.  See Harbor Healthcare Sys., 5 F.4th at 599 (finding callous disregard even where a warrant was obtained).

[19] The Court notes that the Affidavit did suggest some intentional action.  For example, SA Evans stated that a witness told him that missing secure hash algorithm ("SHA") files were a "red flag . . . that someone had manipulated the data" and that the witness believed that "the removal of the SHA files was an intentional act by someone."  [Doc. 22-2, p.

crime, it need only present a fair probability that evidence of criminal activity will be found in the place to be searched." United States v. Safahi, No. 23-10032, 2024 WL 863363, at *2 (9th Cir. Feb. 29, 2024) (citation modified).  Moreover, even if the Affidavit did lack probable cause because of a failure to allege intent, Petitioners' argument hinges on the idea that a lack of probable cause equates to callous disregard.  But Petitioners do not offer any authority for this proposition. And, in view of other cases' discussions of callous disregard, the Court declines to adopt such a rule here.  See Richey, 515 F.2d at 1243 n.8 (implying that a warrant simply challenged as "invalid" is not enough to establish callous disregard, but "fraudulent or deceitful methods" in the warrant process might be); Burum v. United States, No. 11-01570, 2014 WL 12596719, at *4 (C.D. Cal. Apr. 2, 2014) (noting "that a callous disregard for [a movant's] constitutional rights is a higher threshold than a mere violation of [a movant's] constitutional rights" (emphasis omitted)).  Simply put, Petitioners must do more to establish callous disregard.

---

10].  As to tabulator tapes, SA Evans reported that a witness thought that someone had "manipulated the times on the reports" because the poll-closing time and the report-printed times were too close together.  Id. at 14.

31

### b. Omission of Material Facts

Petitioners next argue that their rights were callously disregarded because the Affidavit omitted material facts. In Petitioners' view, these omissions misled the Magistrate Judge, whom they contend would not have issued the warrant if the omitted information had been included. Petitioners specifically focus on omitted facts related to pristine ballots, missing and duplicate ballot images, tabulator tapes and biases of the witnesses interviewed by SA Evans. The Court will summarize these alleged omissions in turn.

As discussed previously, the Affidavit stated that the discovery of pristine ballots during the Risk Limiting Audit showed that some type of wrongdoing may have occurred in the 2020 election. Petitioners argue that the Affidavit is incomplete and/or misleading because pristine ballots are a typical feature of elections and that they can occur because military members and other overseas voters cast ballots in a different manner than Georgians voting from within the state. [Doc. 30, pp. 21–22]. They further assert that the Affidavit is misleading because it omitted any reference to the Georgia Secretary of State's investigation which found that the same pristine-ballots claim was unsubstantiated. Id. at 22–23.

Petitioners go on to address the Affidavit's assertion that "[o]n the day of the deadline to report the Recount results, Fulton County reported a recount totaling

32

511,343 ballots, 17,434 ballots fewer than original[ly] counted.  The following day, Fulton County then reported a total of 527,925 ballots counted." [Doc. 22-2, p. 7]; see [Doc. 30, pp. 23–24].  Petitioners contend that this statement was misleading because 511,343 was not "reported" by Fulton County—rather, the Recount had not yet finished, and 511,343 was merely an interim number used to keep track of votes already counted at that point in the process.  [Doc. 30, pp. 23–24].  According to Petitioners, the 527,925 ballots counted the next day was the final number after counting had actually finished.  Id.

As to ballot images and duplicate ballots, Petitioners argue that the Affidavit's statements were misleading.  Specifically, Petitioners contend that the Affidavit omitted several basic facts, including that:  in 2020, Georgia law did not require the preservation of ballot images; that saving ballot images was optional for aggregating election results; and that investigators found that scanning some ballots multiple times did not affect election results.  Id. at 13–14; [Doc. 30-1, p. 12].  Additionally, Petitioners assert that ballot images cannot have been the basis for a violation of 52 U.S.C. § 20701 because they are not records related to an "act requisite to voting" as required by the statute.  [Doc. 30, pp. 13–14].  Finally, they claim that the Affidavit omitted any innocent explanation for scanning duplicate ballots (such as mismanagement or paper jams) and similarly offered no

33

explanation for the witness's conclusion that missing ballot images meant that duplicate ballots were counted.  [Doc. 30-1, p. 13].

Petitioners further assert that the Affidavit's statements concerning tabulator tapes were misleading.  While the Affidavit quoted a witness who called these tapes the "holy grail" for calculating the final ballot count, [Doc. 22-2, p. 14], Petitioners argue that the Affidavit omitted findings from the Georgia Secretary of State's investigators that tabulator tapes were not part of determining official election results.  [Doc. 30, p. 24].  According to Petitioners, the assumption that missing or incorrect tabulator tapes equals missing ballots is incorrect.  Id.

Finally, Petitioners contend that the Affidavit omitted several facts about the biases of the witnesses.  First, the Affidavit said that the criminal investigation began with a referral from Olsen.  But Petitioners say the Affidavit left out the fact that Olsen had been sanctioned by numerous courts for making unsubstantiated claims about elections and had been disciplined by the State Bar of Arizona regarding the same conduct.  Id. at 25–26.  Second, Petitioners argue that the Affidavit failed to include information that one witness was referred to the FBI in 2023 for sending threatening messages to members of the SEB and to Georgia Secretary of State Raffensberger.  Id. at 26.  Third, Petitioners contend that the Affidavit "relie[d] on witnesses who, among other things, participated in Kari

34

Lake's failed efforts to contest the 2022 gubernatorial election in Arizona, and reportedly run a Telegram channel devoted to election conspiracies."[20]  Id.

In sum, Petitioners ask the Court to examine the aggregate of these omissions and find that the Affidavit would have lacked probable cause if the information identified above had been included.  They further contend that SA Evans was "reckless" in making the omissions and, as a result, disregarded their constitutional rights.  Id. at 19.

This Court recognizes that Petitioners think the Affidavit should have contained additional information.  However, some of the omissions that Petitioners take issue with are not truly omissions at all but rather appear in the Affidavit in a different form.  For instance, Petitioners argue that the Affidavit omitted important context regarding duplicate ballot images, but SA Evans's description of the investigation did include a witness statement indicating that "the images are just duplicates" and that the "concern [was] less about the images and more about the ballots and voter count."  [Doc. 22-2, p. 11].  Similarly, while Petitioners fault the Affidavit for purported omissions as to pristine ballots, the Affidavit contained statements from one witness explaining that "there would be pristine ballots in

---

[20] It is unclear from Petitioners' brief whether one or multiple witnesses are involved in each of these activities.

every election" and offered one explanation for the occurrence of such ballots.  Id. at 19.  Likewise, though Petitioners contend that the Affidavit made material omissions concerning tabulator tapes, the document did incorporate a witness's statement that "[t]he original tabulator tapes [were] not used during the recount because the ballots [were] scanned utilizing a different machine" and that "the ballots are what mattered."  Id. at 15.

Although this Court does not entirely agree with Petitioners' characterization of all the alleged omissions in the Affidavit, the Court does recognize that the Affidavit was defective in some respects.  For instance, the Affidavit stated that Fulton County reported 511,343 ballots "[o]n the day of the deadline to report the Recount results"—17,434 ballots short of the Original Count.  Id. at 7.  The Affidavit then asserted, without further explanation, that Fulton County reported a total of 527,925 ballots the following day.  Id.  As Petitioners pointed out in their briefing and during the evidentiary hearing, this statement was misleading given that there was a scanner programming error and Fulton County was unable to finish scanning the ballots on time.  [Doc. 30, p. 23].  Thus, the 511,343 was "an internal report that was used to understand where the county was at" in the count as opposed to a final number.  [Doc. 76, p. 121].

The Court also agrees with Petitioners that some of the Affidavit's statements regarding the importance of ballot images and tabulator tapes are troubling. For instance, while the Affidavit included one witness's statements expressing concern over modification dates on ballot image files long past the conclusion of the 2020 election, [Doc. 22-2, p. 10], it failed to explain that this modification date could have been caused by personnel from the Secretary of State's Office simply renaming the file, [Doc. 76, p. 112]. Likewise, the Affidavit's inclusion of one witness's description of tabulator tapes as the "holy grail" is confusing when read in conjunction with another witness's statement that the tapes were not even used during the Recount. [Doc. 22-2, pp. 14–15]. Again, the Court agrees with Petitioners that such features within the Affidavit are problematic. Nevertheless, the Court is cognizant that its task is to assess whether Respondent callously disregarded Petitioners' rights. As Respondent observed during the evidentiary hearing, "the Court may think [the Affidavit] is a B or B minus or some other grade, but that's not the issue." [Doc. 76, p. 210]. Rather, the issue is whether Petitioners have supplied sufficient evidence that their rights were callously disregarded.

In analyzing whether callous disregard exists here, the Court notes that the Affidavit in this case was eighteen pages long and included statements from more

than ten witnesses concerning the 2020 election in Fulton County.  [Doc. 22-2].

While the Affidavit referenced witness statements critiquing the election,

describing errors and discussing potential wrongdoing, it also included other

witness statements suggesting that these perceived issues during the election did

not go beyond benign human error.  Id.  Indeed, "[a]t least 20 times the [A]ffidavit

included contrary information and perspectives."[21]  [Doc. 76, p. 79].  It seems to

the Court that SA Evans presented the Magistrate Judge with facts that both hurt

and helped him.  While the Affidavit was certainly far from perfect, this is not a

situation where an officer left out all the facts that might undermine probable cause

or where an officer intentionally lied.[22]  Ultimately, when examining the totality of

the Affidavit, including SA Evans's inclusion of contrary information and the

supposed omissions, the Court cannot say that the Affidavit was so deficient that

---

[21] For example, in addition to the contrary information already discussed, the Affidavit provided that some ballot images may be missing if they "were stored on a memory card and it was not uploaded correctly or became corrupt."  [Doc. 22-2, p. 11].  It also mentioned that the reports from Seven Hills Strategies and the Performance Review Board found no evidence of intentional misconduct.  Id. at 21.  The inclusion of this information indicates a lack of callous disregard.

[22] Petitioners never claim that SA Evans lied.  Instead, they assert that he was reckless. The Court recognizes, though, that Petitioners' ability to ascertain SA Evans's state of mind was affected by Respondent's denial of a Touhy request for his testimony and this Court's subsequent order quashing the subpoena for his testimony.  [Doc. 65].  The Court notes, however, that Petitioners were not prevented from calling other witnesses who could supply additional context supporting their assertions of recklessness.

its shortcomings rise to the "high[] threshold" of callous disregard.[23]  Vasarely,

2025 WL 2624156, at *8.

### ii. Petitioners' Argument that the Manner in which the Warrant Was Executed Constitutes Callous Disregard

In addition to their arguments concerning the substance of the Affidavit,

Petitioners contend that their rights were callously disregarded due to the manner

in which the warrant was executed.  Petitioners argue that the manner of the search

was unreasonable because it interfered with state sovereignty and ongoing civil

proceedings.[24]  Petitioners also assert that the manner was unreasonable because

the statute of limitations for the two potential offenses the Affidavit cites has

expired.

---

[23] In making this determination, the Court does not suggest that an affidavit can never be so deficient as to constitute callous disregard.  Rather, the Court merely finds that the standard is not met here.  In doing so, the Court is mindful of the Eleventh Circuit's guidance that "the vast majority of subjects of a search warrant have not experienced a 'callous disregard' of their constitutional rights." Trump, 54 F.4th at 698.  Indeed, the height of this standard is what ensures that "equitable jurisdiction remains extraordinary." Id.

[24] Petitioners seemingly conflate unreasonableness with callous disregard.  In other words, Petitioners argue that if the search was unreasonable, their rights must have been callously disregarded.  Callous disregard, however, is a different inquiry from reasonableness.

39

### a. *Interference with State Sovereignty*

Petitioners argue that when Respondent seized the election records in this case, "it did so in callous disregard of Georgia's constitutional rights, powers and responsibilities under the Electors Clause and the Tenth Amendment as implemented through the State's election laws." [Doc. 30, pp. 31–32]. Petitioners contend that by seizing the records, the BRE is prevented "from carrying out its duties under Georgia law to guarantee the secrecy of the ballot and to ensure that ballots and other election records are held under seal by the Clerk." Id. at 32 (citation modified). In short, Petitioners claim that the "seizure of ballots infringes upon [their] sovereign interests in safeguarding election integrity, maintaining accurate records, and reassuring voters that their ballots will not be manipulated or misused." Id. at 33.

As stated above, Petitioners assert that the seizure interfered with their ability under the Electors Clause and the Tenth Amendment to administer elections. The Court disagrees. The records at issue in this case concern the November 2020 presidential election, and the seizure of those records occurred in January 2026. Thus, the seizure of the records did not interfere with Fulton

40

County's ability to carry out the 2020 election because it happened over five years after the election took place.[25]

Petitioners also argue that the seizure prevented the BRE from "carrying out its duties under Georgia law 'to guarantee the secrecy of the ballot' and to ensure that ballots and other election records are held under seal by the Clerk." Id. at 32. (citing O.C.G.A. §§ 21-2-70(13), 21-2-500(a)).  Petitioners, however, have presented no evidence that the election materials were manipulated, misused or publicly disclosed after the seizure.  In other words, Petitioners have not shown that the secrecy of the ballot has been compromised by the seizure.  Moreover, this argument is weakened by the fact that, prior to the seizure, the BRE had already received an order in the Superior Court Action to provide copies of the materials to the SEB.  [Doc. 30, p. 30].  Consequently, the BRE was poised to release copies of the records to the SEB already—undermining Petitioners' argument that the seizure inflicted callous disregard upon them by interfering with the "secrecy of the ballot" or the sealed nature of the records.  Id. at 32.

---

[25] And Petitioners have made no argument that the 2020 election records are somehow integral to the State's ability to hold future elections.  Indeed, such an argument would be unpersuasive given that, absent a court order, the relevant Georgia records retention statutes allow destruction of the materials after twenty-four months.  O.C.G.A. §§ 21-2-73, 21-2-390, 21-2-500(a).

41

In sum, Petitioners have not demonstrated how the seizure of materials from an election that occurred five years ago "infringes upon [their] sovereign interests in safeguarding election integrity." Id. at 33. The Court finds this especially true in light of the fact that—in a hearing held on June 24, 2024—the Clerk requested permission to destroy the records. [Doc. 87-1, at 00:31]. Moreover, Petitioners did not present any evidence that voters are concerned that "their ballots will . . . be manipulated or misused," [Doc. 30, p. 33], and they did not explain whether these purported concerns relate to old ballots from the 2020 election or uncast ballots in a future election. Accordingly, the Court finds that Petitioners have not shown that Respondent's alleged interference with principles of state sovereignty demonstrates a callous disregard for their constitutional rights.[26]

---

[26] Respondent argues that, because Congress can define offenses related to federal elections, the United States retains the authority to investigate such offenses, including violations of 52 U.S.C. §§ 20701 and 20511. [Doc. 32, p. 36]. Addressing this argument, Petitioners contend that "the issue is not whether the federal government can criminalize certain election misconduct," but whether it can investigate misconduct in the manner it did here. [Doc. 39, pp. 25–26]. While the Court agrees with Petitioners that the federal government's investigative ability is not unfettered from Constitutional considerations, it does not find that Respondent's conduct here rises to the level of callous disregard for Petitioners' constitutional rights. Importantly, the seizure at issue in this case did not interfere with the State's ability to conduct the 2020 election or certify election results, nor have Petitioners shown that it will hinder the State's ability to conduct future elections.

42

*b. Interference with Ongoing Civil Proceedings*

As stated previously, there are two civil proceedings involving the 2020 election records—the Superior Court Action and the Federal Court Action—that were stayed after the search warrant was executed in this case.  Petitioners contend that Respondent's seizure was unreasonable because the seizure was made "without regard to the consequences" to these existing proceedings.  [Doc. 39, p. 26].  Petitioners further argue that the criminal investigation "was, in reality, a late-breaking pretext" for Respondent to get the documents after it suffered "setbacks" in these actions.  [Doc. 105, p. 1].  Respondent, on the other hand, argues that no callous disregard exists here because "[t]he government can bring parallel actions and very frequently does pursue both civil and criminal proceedings."  [Doc. 76, p. 68].

As an initial matter, the Court agrees with Respondent that the government can simultaneously pursue both civil and criminal proceedings involving the same subject matter.  In other words, a constitutional violation does not exist simply because the government is pursuing remedies in both the civil and criminal spheres.  See United States v. Goldstein, 989 F.3d 1178, 1202 (11th Cir. 2021) (acknowledging that "parallel government investigations" are "common and generally proper"); see also United States v. Stringer, 535 F.3d 929, 936 (9th Cir.

43

2008) (stating that "the government may conduct parallel civil and criminal investigations without violating" the Constitution).  Consequently, this Court is not willing to make a finding of callous disregard simply because the civil actions relating to the 2020 election records were ongoing when the FBI executed its search warrant.

Although the general rule provides that the government may bring parallel actions and conduct simultaneous investigations, an exception exists.  Indeed, a violation of the Constitution may occur where two arms of the government collude in bad faith "to deprive the defendant of his constitutional rights."  Goldstein, 989 F.3d at 1202.  "Such bad faith collusion generally involves affirmative misrepresentations or trickery or deceit by the investigating authority to get the defendant to voluntarily turn over documentary or physical evidence relevant to the criminal investigation."  Id. (citation modified).  By way of example, "the government may act in bad faith if it brings a civil action solely for the purpose of obtaining evidence in a criminal prosecution and does not advise the defendant of the planned use of evidence in a criminal proceeding."  Stringer, 535 F.3d at 937.

Petitioners suggest that Respondent obtained the warrant in bad faith after encountering procedural hurdles in the Superior Court Action and the Federal

44

Court Action. Given this argument, it is important for the Court to detail the relevant timeline.

On November 5, 2024, the SEB issued two subpoenas to the BRE seeking election materials from the 2020 election.[27] [Doc. 71-4, p. 2]. On the date that the responses to the subpoenas were due—November 18, 2024—the BRE filed the Superior Court Action seeking to quash the subpoenas. Id. at 3. Over a year after the action was filed, the Superior Court held a hearing, and a ruling was issued on December 22, 2025. Id. at 6. In its order, the Superior Court determined that the BRE was required to comply with the subpoenas—in other words, produce the records to the SEB—but that the SEB should bear the cost of compliance, which the BRE estimated to be approximately $400,000.[28] Id. at 5. The parties were ordered to provide evidence regarding costs no later than January 14, 2026. Id. at 5–6.

On October 30, 2025, while the Superior Court Action was ongoing and before the Superior Court determined that the subpoenas would not be quashed,

---

[27] As explained earlier, the SEB is the Georgia State Election Board, and the BRE is the Fulton County Board of Registration and Elections.

[28] The Superior Court noted that the BRE's estimates could be "off by an order of magnitude." [Doc. 71-4, p. 5].

45

Harmeet K. Dhillon, an Assistant Attorney General with the Civil Rights Division, sent a letter to Sheri Allen, the Chairperson of the BRE, requesting access to Fulton County's election records.  [Doc. 71-1].  Specifically, Dhillon asked Allen to present for inspection all used and void ballots, stubs of all ballots, signature envelopes and corresponding envelope digital files from the 2020 General Election in Fulton County.  Id.  In response to the request, the BRE stated that it could not comply because it was not in possession of the records and the records were being held by the Clerk under seal.  [Doc. 71-2, p. 2].  On November 21, 2025, Dhillon made an identical request for inspection of the records to the Clerk and the judge in the Superior Court Action.  [Doc. 71-3].  When the information was again not made available for inspection, on December 11, 2025, the Attorney General filed the Federal Court Action seeking a court order to allow access to the records.  Alexander, Doc. 1.  Eleven days later, on December 22, 2025, the Superior Court denied the BRE's motion to quash.  [Doc. 71-4].

On the morning of January 5, 2026—after the Superior Court had already ordered the BRE to produce the election materials to the SEB—Albus received Olsen's criminal referral regarding the 2020 election in Fulton County.  [Doc. 101, p. 2].  Later that day, at 8:36 PM, the Clerk filed a motion to dismiss the Federal Court Action.  Alexander, Doc. 18.  The day after Albus received the referral and

46

the motion to dismiss was filed, the FBI opened an "assessment." [Doc. 101, p. 2]. On January 14, 2026, two days after SA Evans put in a request to do so, the matter was opened as a full investigation. Id. SA Evans began drafting his investigative summary based on witness interviews on January 19, 2026, which he converted to the format of a search warrant affidavit on January 22, 2026. Id. at 3–4. SA Evans ultimately sought the warrant on January 27, 2026, and it was signed and executed the following day. [Doc. 82-3]; [Doc. 22-1]; [Doc. 22-2].

The timeline set forth above demonstrates that there has been ongoing activity involving the 2020 election records since at least November 2024—when the SEB first requested the records. Yet, the warrant was not sought until more than a year later. For the reasons explained below, the Court is not persuaded that Petitioners have shown that Respondent created an "ongoing criminal investigation" to sidestep procedural hurdles in the Superior Court Action or the Federal Court Action.

As to the Superior Court Action, Petitioners point to no evidence to support their theory that the order denying the BRE's motion to quash prompted the FBI's criminal investigation and seizure at issue in this case. Indeed, the Superior Court

47

largely ruled in favor of the SEB,[29] granting it the right to access the documents.[30]

If Petitioners' theory is correct—that the warrant was obtained to avoid delays and

the procedural hurdle of paying costs—the Court does not understand why the

Superior Court Action was pending for more than a year without the FBI taking

action.  Indeed, action was only taken after the SEB prevailed.  It seems to the

Court that if the two governmental entities were truly acting in bad faith to sidestep

the Superior Court Action and expedite access to the records, the FBI would have

obtained a warrant much sooner.

---

[29] The only outstanding issue was costs.  While Petitioners suggest that the requirement
for the SEB to pay costs was a motivating factor for the FBI to obtain the warrant in this
case, Petitioners did not submit any evidence that the SEB could not—or would not—pay
the costs to obtain the records.  Petitioners also argue that the FBI decided to get the
warrant because the judge in the Superior Court Action indicated, in his December 22,
2025 order, "that he would supervise access to the records."  [Doc. 105, p. 3].  The Court
has reviewed the December 22, 2025 order, and it did not say anything about supervision.
[Doc. 71-3].  The Superior Court did, however, mention supervision in its February 9,
2026 order staying the Superior Court Action.  [Doc. 30, pp. 30–31, 35].  Notably, this
order was issued after the seizure.  Thus, Petitioners have pointed to no evidence that
Respondent would have been worried about the Superior Court's oversight at the time the
warrant was executed.

[30] Petitioners argue that the Respondent and the SEB were working together to obtain the
documents.  Assuming that this is accurate, it seems even less likely that Respondent
would feel compelled to create a pretextual criminal investigation when the SEB had
already prevailed in the Superior Court Action and was likely just weeks away from
obtaining the documents.

Petitioners also assert that the warrant was in response to delay in the Federal Court Action. The only delay Petitioners identified in the Federal Court Action, however, was the Clerk's motion to dismiss.[31] Problematically for Petitioners, the evidence shows that the criminal referral to the FBI was made *before* the Clerk filed her motion.[32] The fact that Olsen referred the matter to the FBI before the motion to dismiss was filed cuts against the contention that the criminal investigation was a pretextual response to delay in that case. Without any other evidence on the point, the Court finds that these facts fall short of callous disregard.[33] In sum, the Court is not convinced that the criminal investigation was

---

[31] In their newest filing, Petitioners argue that the motion to dismiss was foreseeable and that Respondent knew about the reasons for dismissal since at least November 2025—before the FBI initiated its criminal investigation. However, if this were true and the Department of Justice's ("DOJ") Civil and Criminal Divisions were colluding to obtain the documents, it would have made more sense for Respondent to obtain a warrant in November, rather than filing the Federal Court Action.

[32] Petitioners are correct to point out that the FBI's initial assessment and the investigation post-dated the Clerk's motion to dismiss filed on the evening of January 5, 2026. The FBI's timing, however, makes sense given that Albus received the criminal referral on the morning of January 5, 2026. The FBI naturally began its investigation after, not before, receiving the referral.

[33] The Court recognizes that Petitioners moved to compel additional evidence beyond the date Olsen referred the criminal investigation to the FBI, the date the FBI opened the investigation and the date the DOJ first began drafting the Affidavit. Specifically, Petitioners sought evidence relating to "any meetings or communications . . . in which DOJ officials . . . discussed using a criminal search warrant in response to delays" in the Federal Court Action. [Doc. 89-1, p. 3]. Because the Court is constrained to follow applicable law regarding Touhy requests, Petitioners' request for these communications was denied. [Doc. 100].

49

created in response to procedural hurdles in either the Superior Court or Federal

Court Action.[34]

### c. Statute of Limitations

Finally, Petitioners argue that the manner of the seizure was unreasonable

because the statute of limitations for the two offenses listed in the Affidavit—52

U.S.C. §§ 20701 and 20511—has expired.  Notably, Petitioners admit that the

potential expiration of the limitations period "does not necessarily negate probable

cause."  [Doc. 30, p. 27]; see also [Doc. 76, p. 40].  Yet Petitioners argue that the

possible expiration of the statute of limitations caused the manner of the seizure to

be unreasonable because "Respondent lacked any legitimate interest in executing a

seizure." [Doc. 30, pp. 27–28].  In Petitioners' view,

---

[34] The Court acknowledges that, at the hearing, it stated that it would be a "good argument" in support of callous disregard if members of the DOJ's Criminal Division invented the criminal investigation out of whole cloth as a means of obtaining documents that members of the DOJ's Civil Division had yet to receive because of delays in the Federal Court Action.  [Doc. 76, pp. 73–74].  Here, however, the record indicates that the referral from Olsen occurred prior to the Clerk filing the motion to dismiss in the Federal Court Action.  [Doc. 101, p. 2].  Thus, there was a pre-existing basis for the criminal investigation that was not entirely tethered to the timing of proceedings in the Federal Court Action.  Knowing this, the Court does not find it appropriate to now make judgments about when various stages of the FBI's criminal investigation occurred, nor do Petitioners present any authority supporting the proposition that the timing of an investigation can rise to the level of callous disregard.  Indeed, the Eleventh Circuit has cautioned that the high standard of callous disregard is, in part, to prevent "needless judicial intrusion into the course of criminal investigations—a sphere of power committed to the executive branch." Trump, 54 F.4th at 698.

> the issue is not that a statute of limitations defect per se defeats probable cause; it is that Respondent does not have a legitimate, let alone significant, interest in a criminal investigation that cannot yield a criminal prosecution, especially when balanced against Petitioners' competing governmental interest in retention of their own records.

[Doc. 39, p. 24] (emphasis omitted).  Petitioners ultimately assert that the Court should balance Petitioners' privacy interests in the election records with Respondent's need for the evidence.[35]  Id.

The Court acknowledges that this case involves records from the 2020 election and that the limitations period for the statutes identified in the Affidavit is five years.  The Court further recognizes that many parts of the Affidavit refer to activity or potential wrongdoing that occurred more than five years ago.  While this may be true, the Court cannot ignore that a witness told SA Evans that some of

---

[35] To support the argument that the Court should weigh Petitioners' privacy interests against Respondent's need for the evidence in deciding whether Petitioners' rights were callously disregarded, Petitioners cite to Winston v. Lee, 470 U.S. 753 (1985).  But that case is inapposite.  In Winston, the Commonwealth of Virginia sought to compel a suspect accused of attempting to commit armed robbery to undergo a surgical procedure under a general anesthetic for removal of a bullet lodged in his chest.  Id. at 755.  In analyzing the "reasonableness of surgical intrusions beneath the skin," the Court focused on the extent of the intrusion on the suspect's privacy interest and on the Commonwealth's need for the evidence.  Id. at 760, 763.  Ultimately, the Court determined that "[a] compelled surgical intrusion into an individual's body for evidence . . . implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime."  Id. at 759.

the ballot images may have been modified as recently as January 11, 2024—which is well within the statutory period.[36]  [Doc. 22-2, p. 10].

The Eleventh Circuit has held that "whether a valid statute of limitations defense exists is not a cut and dry matter."  See Pickens v. Hollowell, 59 F.3d 1203, 1208 (11th Cir. 1995).  Given the complexities in determining whether a statute of limitations defense is viable, the limited amount of evidence in the record and SA Evans's assertion that at least part of the investigation involves activities that occurred during the limitations period, the Court is not convinced that Respondent has no legitimate interest in the election records.  In short, while the Court understands that Petitioners believe that the statute of limitations has expired for all potential criminal activity and speculate that criminal charges will never be brought, this Court finds that the execution of the warrant under these circumstances does not give rise to a constitutional claim, let alone a showing of a callous disregard for constitutional rights.  Id. at 1207–08 ("The existence of a statute of limitations bar is a legal question that is appropriately evaluated by the district attorney or by a court after a prosecution is begun, not by police officers

---

[36] Additionally, the Court notes that one of the criminal statutes cited in the warrant, 52 U.S.C. § 20701, requires a twenty-two-month retention period for certain election materials.  If any misconduct occurred within this twenty-two-month period, it would trigger the statute of limitations at that time.  In other words, conduct toward the middle and end of this period might still be timely for prosecution.

executing an arrest warrant."). Ultimately, the potential expiration of the statute of limitations does not demonstrate that Petitioners' constitutional rights were callously disregarded.

***

In summary, Petitioners have not shown that their rights were callously disregarded either through supposed defects in the warrant or through the manner in which the warrant was executed. The Court also finds that—when considering the cumulative weight of Petitioners' argument concerning defects in the warrant and their argument concerning the manner in which the search was executed—they have not demonstrated callous disregard. Therefore, this factor weighs against exercising equitable jurisdiction.[37] Although the Court could end its analysis here because a finding of "callous disregard for constitutional rights" is indispensable to

---

[37] Although not applicable here, the Court notes that a lengthy retention of the seized materials without charges "may well involve callous disregard for constitutional rights." Bennett v. United States, No. 12-61499-CIV, 2013 WL 3821625, at *13–14 (S.D. Fla. July 23, 2013) (recognizing that while a certain amount of time is necessary to review seized materials, draft an indictment and file criminal charges, that time is not unlimited). In this case, Respondent has only had the records in its possession for just over three months and, for at least some time while this case has been pending, voluntarily abstained from looking at the records. [Doc. 51, pp. 5–7]. If Respondent retains the records at issue here for a lengthy period, beyond what would be necessary for bringing criminal charges, Petitioners may well be able to establish callous disregard at that juncture.

53

invoking equitable jurisdiction, the Court will nevertheless address the remaining factors.  Trump, 54 F.4th at 701.

### B. Other Factors

Although Petitioners bear the burden of establishing that the Court should exercise equitable jurisdiction—which has been described as exceptional and anomalous—Petitioners did not address the three remaining Richey factors in detail.[38]  This is significant because the Eleventh Circuit has emphasized "again and again that equitable jurisdiction exists only in response to the most callous disregard of constitutional rights, and even then only if other factors make it clear that judicial oversight is absolutely necessary."  Id. at 698.

#### i. Individual Interest and Need for the Material

The second factor requires courts to consider whether the movant has an individual interest in and need for the return of the materials at issue.  As an initial matter, the Court notes that an interest in the property is not enough.  Indeed, "personal interest in or ownership of a seized document is not synonymous with the need for its return" because "[i]n most search warrants, the government seizes

---

[38] In Petitioners' Amended Motion for Return of Property, which is thirty-seven pages long, only two pages address these factors.  [Doc. 30, pp. 34–35].  Petitioners' thirty-page Reply in Support of Amended Motion for Return of Property is a little more detailed in that almost four pages discuss these factors.  [Doc. 39, pp. 27–30].

property that unambiguously belongs to the subject of a search." Id. at 699.

Because a possessory interest alone is not enough to establish need, the Eleventh

Circuit has held that a movant must do more than offer "vague allegations" of

need; it must "identify[] 'specific' documents" and explain "the harm from their

'seizure and retention.'" [39] Id. (quoting Harbor Healthcare Sys., 5 F.4th at 600).

In their briefing, Petitioners argue that they need the election records so that

they can: (1) rebut "unfounded attacks on the 2020 election with evidence"; (2)

fulfill open records requests; and (3) comply with orders from the civil cases.

[Doc. 39, pp. 3, 28]. Beginning with Petitioners' claim that the documents are

needed to defend against allegations of election fraud, the Court notes that

Petitioners have failed to identify which documents they need. Without any

specificity, it is unclear whether Petitioners need all the documents to defend

against the allegations or just some of them. Moreover, the Clerk once requested

---

[39] The Court notes that several times during the evidentiary hearing, Petitioners suggested that the Court should conduct a balancing test which measures Petitioners' need for the seized materials against Respondent's need. See [Doc. 76, p. 19] (counsel for Petitioners questioning whether Respondent could "possibly really have an articulable reason to keep what must be one million pieces of paper"). As explained by the Eleventh Circuit, Petitioners are "wrong to suggest that jurisdiction somehow depends on the balance of interests between the parties—the relevant inquiry is if [Petitioners need] the documents." Trump, 54 F.4th at 699. The Eleventh Circuit has specifically stated that the standard should not be reversed. Id. (rejecting the plaintiff's attempt to "reverse the standard" and clarifying that the plaintiff's task "was to show why *he* needed the documents, not why the government did not").

permission to destroy the records.  [Doc. 87-1].  In the Court's view, if the records were necessary to combat allegations of fraud, the Clerk would not have sought to destroy them.[40]  Even more tellingly, when the FBI seized the election records, the Fulton County Director of Registration and Elections stated that the FBI could "make paper airplanes" with the records for all she cared.  [Doc. 87-2].  If Petitioners truly needed the records, this statement makes little sense.

In further considering Petitioners' argument that they need the documents to combat election misinformation, the Court cannot ignore the fact that Petitioners have copies of the documents.  The evidence at the hearing established that Respondent has made copies of the seized election records and provided those copies to Petitioners.  See also [Doc. 57, p. 4] ("[T]he United States is providing Petitioners a digital copy of the records scanned by the FBI . . . .").  Because Petitioners have the copies, this Court finds that Petitioners already have the ability to rebut attacks on the 2020 election and respond to any allegations of

---

[40] Petitioners contend that even though the Clerk sought permission to destroy the records, they have a new need for the records because President Trump continues to claim that people cheated in the 2020 election.  The Court is not convinced that Petitioners have a new need because the election has been continually attacked since 2020.  See [Doc. 76, p. 45] (Petitioners stating that "a week doesn't go by when somebody in the administration doesn't make an allegation of fraud for what happened six years ago.").

misconduct.[41]  See Gulf Coast Pharms. Plus v. United States, No. 22-CV-263, 2023 WL 3099873, at *5 (S.D. Miss. Apr. 26, 2023) (determining that the need factor weighed against ordering the return of the property where the petitioner had "copies of all of the property seized and currently in the possession of the United States").

Petitioners also contend that they need the elections records to respond to open records requests.  As an initial matter, Petitioners are not completely unable to fulfill open records requests because, again, they have copies of the documents. At a minimum, the copies allow Petitioners the ability to provide some information to the public if it is requested.[42]  Setting aside the fact that Petitioners have copies, the argument that the records are needed to respond to open records requests is speculative.  At the hearing, Petitioners admitted that no open records requests

---

[41] The Court recognizes that Petitioners claim that the copies are insufficient for their needs because some of the copies are unreadable.  Petitioners can easily remedy this issue, however, by reaching out to Respondent for new copies of any unreadable documents.

[42] While Petitioners contend that they need the originals to comply with Georgia's open records laws, Georgia's Open Records Act does provide a way for an agency to partially respond to a request where records exist but are currently unavailable.  Namely, the statute states that "[i]n any instance where records are unavailable within three business days of receipt of the request, and responsive records exist, the agency shall, within such time period, provide the requester with a description of such records and a timeline for when the records will be available for inspection or copying and provide the responsive records or access thereto as soon as practicable."  O.C.G.A. § 50-18-71(b)(1)(A).

have been made since this case was filed and that none are currently pending.

[Doc. 76, p. 95].  Moreover, Petitioners failed to present any evidence concerning

the number of prior record requests, which documents were sought in those prior

requests or when the most recent request was made.  The Court thus has no way of

determining whether Petitioners are likely to get open records requests while

Respondent has the records.  Without any evidence, the Court is not persuaded by

Petitioners' argument that they need the documents to comply with these

requests.[43]

Lastly, Petitioners assert that they need the documents so that they can

comply with orders in other civil cases.[44]  The Court finds this argument unavailing

because Petitioners have failed to identify which documents are at issue in the

other cases.  For instance, instead of identifying the documents that are needed to

---

[43] Macias did testify that Petitioners may need the documents to respond to open records requests, but Macias provided no corroborating facts to show how often open records requests are made or what has been requested in the past.  [Doc. 76, p. 150] (stating only that original records are valuable "to be able to provide to the public for public records requests").

[44] This argument is odd because, in both of those cases, Petititioners may have to turn the records over to another government entity, which they are trying to prevent here.  Indeed, in the Federal Court Action, if the DOJ's request for the records is granted and an order is entered, Petitioners would simply need to do what has already been done through the FBI's seizure of the materials.  In short, Petitioners are essentially asking for the records back so that, if an order is entered in the Federal Court Action, they can return those records to the DOJ.

comply with the subpoena in the Superior Court Action, Petitioners simply claim that they need *all* the documents back—more than a million pieces of paper.[45]  The generality of this argument is especially problematic because, as noted above, a movant must go beyond "vague allegations" of need and "identify[] 'specific' documents" and explain "the harm from their 'seizure and retention.'"  Trump, 54 F.4th at 699 (quoting Harbor Healthcare Sys., 5 F.4th at 600).  Petitioners have simply failed to set forth a specific need in this case and instead have issued a general demand for the return of all documents seized.[46]

In summary, the Court finds that Petitioners' stated needs for the return of the documents fall short of what is demanded by Richey and its progeny. Accordingly, this factor weighs against exercising jurisdiction in this case.[47]

---

[45] It is the Court's understanding that the subpoena in the Superior Court Action was only for "all used and void ballots, stubs of all ballots, signature envelopes, and corresponding envelope digital files from the 2020 General Election in Fulton County."  [Doc. 1-1, p. 8]. Thus, it is unclear to the Court why Petitioners need *all* the seized election materials back to comply with this particular court order.

[46] And, once again, to the extent that there is some level of need, the Court finds that it is largely ameliorated by the copies that have been provided to Petitioners.

[47] Petitioners also argued at the evidentiary hearing that they have a need for the seized materials because "as a sovereign," they need "to be able to assure voters [that they] are in charge."  [Doc. 76, p. 44].  This argument is not discussed any further herein because Petitioners failed to present any evidence concerning the current mindset or fears of Fulton County voters.  Without an evidentiary basis, the Court cannot find that this is a need that weighs in favor of exercising equitable jurisdiction.

59

### ii. Irreparable Injury

The third factor that courts must consider is irreparable injury.  For irreparable injury, "courts focus on the harmful effects the loss of the property wreaks on the movant."  Times Publ'g Co. v. United States, No. 23-MC-0014, 2023 WL 7411463, at *7 (M.D. Fla. Sep. 22, 2023) (citation modified); United States v. Search of L. Off., Residence, & Storage Unit Alan Brown, 341 F.3d 404, 415 (5th Cir. 2003).

In claiming that they will be irreparably harmed by the FBI's continued retention of the seized records, Petitioners repeat many of the same arguments that they made as to why they need the records.  For instance, Petitioners argue that they will be irreparably harmed because they need to show Fulton County voters that they—not the federal government—are in charge of elections.  [Doc. 76, p. 97]; [Doc. 39, pp. 28–29].  They also claim that they will be irreparably harmed because they must comply with open records requests and court orders.  [Doc. 76, pp. 97–98]; [Doc. 30, p. 34].  Finally, they assert that they will be irreparably harmed because they need to be able to respond to "the constant barrage of criticisms" concerning the 2020 election.  [Doc. 76, p. 98]; [Doc. 39, p. 28].  For the same reasons discussed in the preceding section, these arguments are unpersuasive and fail to show irreparable injury.

In addition to their repeated arguments, Petitioners also contend that they will suffer irreparable injury because (1) they will be unable to verify the chain of custody of the election returns[48] and (2) Respondent may disclose personal identifying information in the records.  [Doc. 30, p. 35]; [Doc. 76, pp. 46–47].  In the Court's view, these arguments are vague and speculative.  As to Petitioners' argument that they will not be able to verify the proper chain of custody, the Court cannot ignore that one of the reasons that the FBI seized the election records was to investigate various chain-of-custody issues that Petitioners now want to protect.  Indeed, the Affidavit stated that a non-partisan report found that the "absentee processes were 'extremely sloppy and replete with chain of custody [i]ssues.'" [Doc. 22-2, p. 20].  The Court thus does not find that Petitioners will be irreparably harmed because they will not be able to address chain-of-custody issues.  See Trump v. United States, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sep. 21, 2022) (disregarding the plaintiff's argument that he could be irreparably injured by the improper disclosure of sensitive information to the public because "a purpose of the United States's efforts in investigating the recovered classified

---

[48] This argument was made in one sentence.  [Doc. 30, p. 35] ("Moreover, Respondent's continued seizure renders Petitioners unable to respond to verify the chain of custody of the election returns.").

61

documents [was] to *limit* unauthorized disclosure of the information they contain[ed]").

The Court is also not convinced that Petitioners will suffer irreparable injury due to the potential disclosure of personal identifying information. At the hearing, Petitioners complained that the copies that Respondent voluntarily provided to them contained personal identifying information, which, in their view, demonstrated that Respondent will not treat the election records with care. [Doc. 76, pp. 46–47]. The fact that Respondent copied materials that contained such information and provided those copies to Petitioners does not suggest that Respondent will disclose that same information to anyone unauthorized to have it.[49] See Trump, 2022 WL 4366684, at *8 ("But permitting the United States to retain the documents does not suggest that they will be released . . . ."). Moreover, Petitioners' fear that Respondent will publicly release sensitive personal information from the documents appears even more improbable given Respondent's assertion that it seized the documents pursuant to an ongoing

---

[49] Respondent's efforts to make copies for Petitioners actually weighs against a finding of irreparable injury and need. See Gulf Coast, 2023 WL 3099873, at *5–6 (determining that the irreparable injury factor weighed against the return of the property where the petitioner had "copies of all of the property seized" and stating that "[i]f the government agrees to return originals and/or copies of documents, it is difficult to envision that movants can comply with the irreparable injury standard" (quoting In re Search Warrant, 684 F. Supp. 1417, 1421 (N.D. Tex. 1988)).

criminal investigation, the substance of which Respondent has consistently argued is privileged.

Ultimately, after considering Petitioners' arguments as to why they will be irreparably injured, the Court finds that this factor weighs against exercising jurisdiction.  In short, Petitioners simply have not shown that concerns about the chain of custody or the disclosure of private information demonstrate an irreparable injury that would warrant exercising equitable jurisdiction.  Moreover, the Court finds that Petitioners' other stated harms—assuring Fulton County voters that they are in charge of elections, responding to open records requests and court orders and addressing criticisms of the 2020 election process—are unpersuasive for the reasons already discussed.

### iii.  Adequate Remedy at Law

Under the final factor, the Court must consider whether the movant has an adequate remedy at law for the redress of its grievance.  Petitioners argue that they have no adequate remedy at law because they cannot file a suit for damages and are not currently subject to a prosecution such that suppression is available.  [Doc. 39, p. 30].  According to Petitioners, their "only proper remedy is a return of property under 41(g)."  Id.  Relying on the Eleventh Circuit's decision in Trump, Respondent argues that this factor weighs against Petitioners because there is no

underlying harm to remedy.  Specifically, Respondent contends that where there has been no constitutional violation, "there is no lawful basis for [Petitioners] to seek a return of the records at issue."  [Doc. 32, p. 39].

The Court is not convinced that either party's arguments are entirely correct as to this factor.  As mentioned directly above, Petitioners essentially argue that they have no adequate remedy at law because they have no other legal means for seeking the return of this property right now.  Notably, the Eleventh Circuit has said that "[t]his is not a sufficient justification" for finding no adequate remedy at law.  Trump, 54 F.4th at 700 (rejecting district court's reasoning that the plaintiff satisfied this factor based on the plaintiff having "no legal means of seeking the return of his property for the time being and no knowledge of when other relief might become available").  The court reasoned, at least in part, that it was unwilling to weigh this factor in favor of equitable jurisdiction because "any subject of a search warrant would like all of his property back before the government has a chance to use it."  Id.; see also id. at 698 (rejecting arguments "that—if consistently applied—would allow any subject of a search warrant to invoke a federal court's equitable jurisdiction").  Ultimately, Trump seems to suggest that a plaintiff must argue something more than the mere inability to seek the return of the property for the time being.

As to Respondent's argument, this Court recognizes that, in <u>Trump</u>, the Eleventh Circuit said that the "real question" is "adequate remedy for what," and stated that "[i]f there has been no constitutional violation—much less a serious one—then there is no harm to be remediated in the first place." <u>Id.</u> at 701 (emphasis omitted).  Relying on <u>Trump</u>, Respondent essentially contends that the adequate-remedy-at-law factor automatically weighs against equitable jurisdiction whenever there is no callous disregard.  The Court is concerned, however, that Respondent reads this passage too broadly because in <u>Trump</u>, the plaintiff never asserted that his rights were violated, and the court's analysis proceeded on that premise.  Here, by contrast, Petitioners expressly allege that their rights were callously disregarded.  Accordingly, Respondent's wholesale reliance on <u>Trump</u> is at least somewhat misplaced.

The Court is sympathetic to Petitioners' argument that their only available option to pursue the election records, at least currently, is through Rule 41(g).  It does not appear, however, that the adequate-remedy-at-law inquiry is limited solely to remedies available at the time the action is filed.  Indeed, where it is likely that a proceeding could be available in the future in which a plaintiff can vindicate his rights, courts are authorized to find that a plaintiff has an adequate remedy at law.  <u>Hunsucker v. Phinney</u>, 497 F.2d 29, 34 n.9 (5th Cir. 1974).

Conversely, "[w]here no future proceeding in which the plaintiff may vindicate his rights seems likely, it becomes more difficult to find an adequate remedy at law." Id.; see also Times Publ'g Co., 2023 WL 7411463, at *7 (stating that "[a]n adequate remedy at law may exist even if it cannot be asserted currently, but rather only at some future date" (quoting In re Stanford, 68 F. Supp. 2d 1352, 1356 (N.D. Ga. 1999)).

In this case, the FBI seized the election records on January 28, 2026, and Petitioners filed this action on February 5, 2026—only eight days later.  It is the Court's understanding that for at least a portion of the time that this action has been pending, Respondent had not analyzed the documents to determine whether they contain evidence of criminal activity.  Importantly, Petitioners have not presented any evidence that Respondent does not intend to ever bring criminal charges.[50] Ramsden v. United States, 2 F.3d 322, 326 (9th Cir. 1993) (concluding that the plaintiff did not have an adequate remedy at law because evidence existed that the government did not plan to prosecute the plaintiff).  Given the recency of the seizure and the fact that Respondent paused its investigation when this action was filed, the Court is not willing to speculate, at least based on this record, that no

---

[50] Petitioners speculate that criminal charges will not be brought because the statute of limitations has expired.  As discussed above, however, it seems possible that charges could be brought that are not barred by the statute of limitations.  See supra n.36.

66

criminal action will ever be brought. Cf. Lin v. United States, No. 22-CV-00055, 2025 WL 2051103, at *10 (E.D. Tex. June 30, 2025) (finding no adequate remedy at law where it had been "more than three years since the government seized the property" and there was no indication that the government planned to invoke a forfeiture or grand-jury proceeding), R. & R. adopted as modified by, 2026 WL 819602 (E.D. Tex. Mar. 25, 2026). This is important because if criminal charges are initiated at some point in the future, Petitioners could vindicate their rights in that criminal proceeding. In short, in light of the early stage of the investigation and the absence of evidence regarding whether a future proceeding is likely, the Court finds that this factor weighs slightly against the exercise of equitable jurisdiction.

***

The seizure in this case was certainly not perfect. However, the Court has carefully considered the factors set forth in Richey and finds that each factor weighs against exercising equitable jurisdiction. More specifically, Petitioners did not establish that their rights were callously disregarded either through the lack of probable cause, omissions in the Affidavit or by the manner of the execution of the seizure. Petitioners also failed to show that they have a need for the documents or that they will be irreparably harmed without the documents, especially since they

67

have copies of them.  Finally, Petitioners failed to demonstrate the absence of an adequate remedy at law.  Ultimately, each of these factors weighs against Petitioners, and therefore the exercise of equitable jurisdiction in this case is not warranted.

## CONCLUSION

This Court acknowledges that the events leading up to this case are, in a variety of ways, unprecedented.  But the "Richey test has been in place for nearly fifty years" and "its limits apply no matter who the government is investigating." Trump, 54 F.4th at 701.  To apply the law differently here because of what this case is about, or whose records are at issue, would "defy our Nation's foundational principle that our law applies to all, without regard to numbers, wealth, or rank." Id. (citation modified).  As explained in this Order, each of the factors, including the first and most important factor—callous disregard—weighs against this Court's exercise of jurisdiction.  As such, Petitioners' Amended Motion for Return of Property pursuant to Federal Rule of Criminal Procedure 41(g) [Doc. 30] is **DENIED**.  The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 6th day of May, 2026.

_____
**J. P. BOULEE**
United States District Judge

68