## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE: GRAND JURY SUBPOENA No.
2026R00350-01

Case No. 1:26-cv-02777-WMR

## FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO QUASH

By its text, Federal Rule of Criminal Procedure 17(c)(2) authorizes the Court to quash a subpoena if compliance would be "unreasonable or oppressive." Yet Respondent asks this Court to enforce a subpoena that is "unreasonable" by any measure. Grand Jury Subpoena 2026R00350-01 (the "Subpoena") amounts to an arbitrary fishing expedition into potential offenses that cannot be prosecuted because they fall outside of any applicable statute of limitations. The Subpoena is untethered to any valid prosecutorial need, and its sweeping demand for the sensitive personal information of thousands of election officials and volunteers would chill the participation of election workers and impair Fulton County's ability to administer its elections.

Instead of engaging in the "reasonableness" balancing that the text of Rule 17 demands, Respondent suggests that a subpoena can never be quashed if it bears any *relevance* to a hypothetical criminal offense, regardless of when that offense

occurred. But neither *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), nor any other case supports such an expansive theory of subpoena power. Federal courts of appeals have repeatedly confirmed this Court's intuition that "reasonableness" must "mean[] something," and it does not mean "that the Government gets to simply decide" what is reasonable. Hearing Transcript ("Tr.") at 23. As those courts have recognized, assessing reasonableness requires weighing the government's need to enforce a subpoena—*i.e.*, the ends—against the costs of compliance—*i.e.*, the means.

Because the five-year statute of limitations has lapsed on an investigation into the 2020 election, which was certified on January 7, 2021, Respondent's need for the requested information is at best de minimis. Respondent now concedes that *Grunewald v. United States*, 353 U.S. 391 (1957), remains good law, and that acts of concealment done after the central criminal purposes of the conspiracy have been accomplished do not extend the limitations period. Supp. Br. at 1–3. So, in the face of this obvious prosecutorial bar, Respondent proposes novel theories for indefinitely extending statutes of limitations. Under Respondent's position that the mere possibility of an obstruction charge cures any statute-of-limitations problem, this Court would be powerless to quash a subpoena in furtherance of a criminal investigation into any historical event, whether it is the 2000 presidential election, the 1960 Kennedy-Nixon election, or the disputed election of 1876. None of this

2

would be remotely "reasonable." Fed. R. Crim. P. 17(c)(2). Moreover, the Subpoena is unreasonable because it is irrelevant and overbroad. Respondent has yet to articulate why, for example, it would need the home address and cell phone number of a bus driver who drove people to polling stations during the 2020 election.

Notably, Respondent does not dispute the record evidence establishing the cost, burden, and oppressiveness of compliance. There is no debate that enforcing the Subpoena would chill the participation of poll workers and impair Fulton County's ability to recruit volunteers and staff to administer its elections.[1] Instead, Respondent attacks only the legal foundation for Petitioner's *First Amendment challenge* to the Subpoena, which would be an independent basis for quashal. But under Rule 17, Petitioner need not establish a First Amendment violation to show that the Subpoena is "unreasonable." Through multiple rounds of briefing and a full hearing, Respondent has not disputed that compliance would have grave consequences for the administration of elections. Courts routinely quash grand jury subpoenas based on the costs of compliance. In this case, the burden on Petitioner's ability to administer elections would be severe. There is simply no basis for finding this Subpoena "reasonable" under Rule 17.

---

[1] *See* Pet'r's Ex. 11, Declaration of Sara Ghazal [Doc. 17-12] ("Ghazal Decl.") ("The risk of having nonpublic personal information, including home addresses, mobile phone numbers, and email addresses disclosed to federal law enforcement, based on service as a volunteer or a simple poll worker, is highly likely to discourage many individuals from participating in elections as poll workers.").

I.      **Respondent's Cramped Conception of "Reasonableness" Under Rule 17 Is Divorced from Text and Precedent.**

The text of Federal Rule of Criminal Procedure 17(c)(2) provides that a subpoena may be quashed if it is oppressive or "unreasonable." But Respondent brushes past the plain meaning of "reasonableness" and addresses only *relevance*. *See* Supp. Br. at 7–9. That approach is contrary to both text and precedent. Though Respondent treats relevance as dispositive, courts have repeatedly explained that relevance is merely one of several considerations in assessing the overall "reasonableness" of a subpoena. *See, e.g.*, *In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d 768, 773 (8th Cir. 2020) (hereinafter, "*The 2019 Subpoena Case*") (expressly rejecting the government's argument that if the evidence is relevant, "the judiciary may not engage in the balancing of interests"); *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585–86 (4th Cir. 2007) (Wilkinson, J.) (hereinafter, "*John Doe*") (affirming quashal upon weighing the balance of the interests). Under Rule 17, the fact that a subpoena seeks relevant information is necessary to establish "reasonableness," but it is far from sufficient. *See, e.g.*, *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984) (explaining that "whether the materials requested are relevant" is *not* one of the only questions "a judge may ever ask in the exercise of his [R]ule 17(c) supervisory power"). Rule 17 demands a weighing of additional considerations that, in this case, leave no doubt that the Subpoena is unreasonable.

### a. Misreading *R. Enterprises*, Respondent Conflates Relevance with Reasonableness.

Respondent's implausibly narrow interpretation of Rule 17's "reasonableness" test is based on a flawed reading of *R. Enterprises*. According to Respondent, *R. Enterprises* held that a subpoena cannot be quashed so long as there is a "reasonable possibility" that subpoenaed records will "produce information *relevant* to" the grand jury's investigation. Supp. Br. at 7 (quoting *R. Enters.*, 498 U.S. at 301) (emphasis added). That is wrong for the reasons that multiple federal courts have identified. *See, e.g.*, *The 2019 Subpoena Case*, 964 F.3d at 773; *United States v. Bergeson*, 425 F.3d 1221, 1225–27 (9th Cir. 2005); *Matter of a Grand Jury Subpoena*, No. 20-3050, 2022 WL 2817606, at *2 (7th Cir. July 19, 2022) (per curiam); *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *8 (D.D.C. Mar. 13, 2026); *In re Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d 1085 (E.D. Wash. 2007).

Relevance and reasonableness are not the same thing. Respondent conflates the *relevance* inquiry at issue in *R. Enterprises* with the broader question of "reasonableness" under Rule 17. But *R. Enterprises* made clear that relevance was not the only basis on which a subpoena could be quashed as unreasonable. *R. Enters.*, 498 U.S. at 301. As the Court explained, it "did not consider" other aspects of "reasonableness" under Rule 17 because the movants objected to the subpoena only

"on relevancy grounds" and "did not challenge the subpoenas as being too indefinite nor did they claim that compliance would be overly burdensome." *Id*. Accordingly, the Court expressly confined its assessment to *relevance* and did not purport to set forth the considerations necessary to evaluate the broader question of "reasonableness." *Id*.; *see also id.* at 306 (Stevens, J., concurring in part and concurring in the judgment) ("[T]he Court's opinion should not be read to suggest that the deferential *relevance* standard the Court has formulated will govern decision in every case, no matter how intrusive or burdensome the request.") (emphasis added). In overlooking the bounds of the majority's analysis in *R. Enterprises*, Respondent wrenches words from their context and ignores its own admonition that the "reasoning underlying" *R. Enterprises* is "just as binding as [the] holding." Supp. Br. at 9 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019)). Unsurprisingly, Respondent does not point to a single court that shares its interpretation of *R. Enterprises* as holding that *relevance* is the sole criterion for "reasonableness" under Rule 17.

In addition to conflating *relevance* with "reasonableness," Respondent is mistaken about how to assess relevance under the *R. Enterprises* framework. Supp. Br. at 7–10. The Court in *R. Enterprises* held that a subpoena may not be quashed "on relevancy grounds" unless "there is no reasonable possibility" that it will produce information relevant to the investigation. *R. Enters.*, 498 U.S. at 301. But

the Court qualified this holding by warning that "[g]rand juries are not licensed to engage in arbitrary fishing expeditions." *Id.* at 299.

Ignoring this limitation, Respondent reads *R. Enterprises* to suggest that the size of the haystack does not matter so long as there might be a needle somewhere within it. Under Respondent's approach to evaluating relevance, the Subpoena at issue here need not have been limited to Fulton County and 2020. Instead, Respondent implies that the DOJ could have requested the personal information of every election worker in the entire *country* for the past dozen presidential elections, as *some* of that information could be relevant to whether a crime was committed in Fulton County in 2020. According to Respondent, "[t]he *category* of documents identifying witnesses to these possible crimes is plainly relevant. Under the *R. Enterprises* standard, that forecloses arguments about whether every one of the persons whose identities are revealed to the grand jury will turn out to be the correct ones." Cross-Mot. at 9 (emphasis in original).

But as the Ninth Circuit has recognized, "*R. Enterprises* does not suggest that by self-defining the 'category of materials' sought as broadly as possible, the government insulates its subpoenas from review." *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1089 (9th Cir. 2016). The Ninth Circuit explained that if Respondent's theory of relevance were correct, the government could seek "all material of a broad generic type that a party possesses," such as "every piece of paper

in a corporation's files" or "all of an individual's emails over a several year period," and the "possibility that *some* of that material would be relevant would suffice to validate the subpoena," regardless of the "vast[ness] [of] its sweep, and no matter the degree to which the subpoena would reach private material of no pertinence to the grand jury's inquiry." *Id.* The Ninth Circuit thus concluded that under a proper reading of *R. Enterprises*, "a subpoena may be quashed when no effort is made to tailor the request to the investigation, even if some fraction of the material the subpoena seeks is relevant." *Id.* In this case, Respondent can hardly pretend that it made a reasonable effort to tailor the request to the investigation. The Subpoena seeks the sensitive personal information of every election worker—from bus drivers to volunteers distributing stickers—who worked on the 2020 election in Fulton County.

Respondent has not identified any legitimate need for the names and personal contact information of thousands of election workers, especially in the context of an investigation where no criminal charges can be brought. Indeed, when the Court asked Respondent whether it was reasonable to request such a broad swath of information, Respondent conceded that "it's difficult to answer that question, particularly now, simply because we don't know what [this information] will tell us as far as what happened or what improprieties may or may not have happened in the 2020 election cycle . . . I don't know that we can definitively say." Tr. at 65. But that

profession of ignorance is not a defense to the Subpoena's overbreadth or unreasonableness. Here, Respondent cannot articulate why it believes proceeding in this manner is appropriate or is likely to yield useful information.

Further, the "relevance" inquiry in *R. Enterprises* was of a fundamentally different character than the one at issue here. In *R. Enterprises*, the movant's "relevance" argument was that the subpoena lacked a sufficient nexus to the underlying investigation, the legitimacy of which was unquestioned. *R. Enters.*, 498 U.S. at 295–96. The Court's analysis thus concerned the likelihood that the subpoena would result in evidence useful to the investigation. *Id.* at 300–01. But here, Petitioner's contention is that the *investigation* is itself irrelevant to any prosecutable crime, as the statute of limitations has expired for the reasons detailed below. Therefore, even if every record produced in response to the Subpoena yielded evidence useful to the "investigation," the subpoenaed information would still be "irrelevant" because the investigation has no nexus to any chargeable criminal offense. In conducting a similar "relevance" analysis in the context of a motion to quash a civil investigative demand, which is subject to "[t]he standards applicable to subpoenas," *Blue Cross & Blue Shield of Ohio v. Klein*, 117 F.3d 1420, 1997 WL 400095, at *2 (6th Cir. 1997) (unpublished table decision), the Sixth Circuit explained that "[o]bviously, the government's investigation must be legitimate in order for it to issue a [civil investigative demand]. If . . . the [policy under

investigation] could never violate antitrust laws, then the investigation is not legitimate." *Id.* at *3. Because this investigation could never lead to a prosecutable offense, the "relevance" framework set forth in *R. Enterprises* is of limited utility in assessing the relevance of the Subpoena.

In attempting to stretch *R. Enterprises* beyond recognition, Respondent ignores the text of Rule 17 and the considerable body of precedent interpreting it. The *relevance* analysis in *R. Enterprises* simply does not cover the Rule 17 "reasonableness" analysis at issue in this case. "Reasonableness" is a far broader inquiry. Further, the relevance framework set forth in *R. Enterprises* lends no support to Respondent's argument that *this* Subpoena is relevant.

### b. Assessing "Reasonableness" Necessarily Entails Balancing the Government's Need Against the Burdens of Enforcement.

As courts have repeatedly explained, evaluating "reasonableness" under Rule 17 requires weighing the government's need for the requested information against the costs that enforcement would impose. *See, e.g.*, *John Doe*, 478 F.3d at 585; *The 2019 Subpoena Case*, 964 F.3d at 773; *Bergeson*, 425 F.3d at 1225–27; *In re Grand Jury Matters*, 751 F.2d at 18.

When a grand jury subpoena is challenged on reasonableness grounds, the Court may consider a wide range of factors. Among other reasons, a subpoena may be "unreasonable" if it is excessively broad, *see In re Grand Jury Proceedings*, 601 F.2d 162, 165 (5th Cir. 1979); overly vague, *see In re Corrado Bros., Inc.*, 367 F.

10

Supp. 1126, 1129 (D. Del. 1973); unduly burdensome, *see John Doe*, 478 F.3d at 585; issued for an improper purpose, *see In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at \*8; or irrelevant, *see R. Enters.*, 498 U.S. at 301. "Reasonableness" is context-dependent and "requires a discretionary, case-by-case inquiry." *Bergeson*, 425 F.3d at 1225. The overarching consideration, however, is whether the government's ends justify the means. *Cf. R. Enters.*, 498 U.S. at 303 (Stevens, J., concurring) ("Rule [17] requires the district court to balance the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other.").

Respondent fails to cite the numerous court decisions that have interpreted "reasonableness" as requiring a weighing of interests. *See, e.g.*, *The 2019 Subpoena Case*, 964 F.3d at 773; *John Doe*, 478 F.3d at 585; *In re Grand Jury Subpoena for THCF Medical Clinic Records*, 504 F. Supp. 2d at 1088–90. Each of these courts has converged on the interest-balancing approach articulated in Justice Stevens's *R. Enterprises* concurrence. *R. Enters.*, 498 U.S. at 303. That is so notwithstanding Respondent's contention that relying on this commonsense textual interpretation of "reasonableness" would somehow "contravene binding authority." Supp. Br. at ii. As courts understand, there is nothing inconsistent about both (a) recognizing the "guiding principle" that "many of the rules and restrictions that apply at trial do not apply in grand jury proceedings," Supp. Br. at ii (citing *R. Enterprises*, 498 U.S. at

11

298), and (b) evaluating the reasonableness of a grand jury subpoena under an interest-balancing approach. Respondent apparently believes that federal courts of appeals across the country have repeatedly flouted binding Supreme Court authority by adopting the approach articulated in Justice Stevens's concurrence.

Precedent confirms that this Court's initial instinct was correct: "reasonableness" must "mean[] something," and it does not mean "that the Government gets to simply decide" what is reasonable. Tr. at 23. Rather, it requires weighing the government's need for the requested information—*i.e.*, the ends— against the costs that compliance would impose—*i.e.*, the means. Here, that balancing decisively favors quashal.

## II.   Because the Statute of Limitations for This Baseless Investigation Has Lapsed, Respondent's Interest in Enforcing the Subpoena Is De Minimis.

Respondent has a negligible interest in enforcing this dragnet Subpoena to explore the faint possibility of a six-year-old misdemeanor that could not be prosecuted. The relevant statute of limitations is five years, and the 2020 presidential election was certified on January 7, 2021. Respondent attempts to circumvent this glaring prosecutorial bar by advancing three defective workarounds: (1) a theory of conspiracy that is foreclosed by *Grunewald*; (2) a theory of obstruction that would extend every statute of limitations forever; and (3) a theory of 2024 conduct that fails to articulate a criminal offense, inaccurately describes the relevant events, and has

nothing to do with the individuals whose information this Subpoena seeks. Because the applicable statute of limitations bars any prosecution of the events that this "investigation" purports to concern, Respondent's need to enforce this Subpoena is de minimis.

### a. Respondent Concedes That *Grunewald* Remains Good Law.

In attempting to end-run the statute of limitations and justify enforcement of this Subpoena, Respondent recasts its initial theory that "[a]ny subsequent criminal acts, or acts in furtherance of a criminal conspiracy, would restart the limitations period." Cross-Mot. at 16. Confronted with *Grunewald*, Respondent now concedes that "acts of concealment" done "after the central criminal purposes of the conspiracy have been attained" do not extend the limitations period. Supp. Br. at 1 (quoting *Grunewald*, 353 U.S. at 402, 405).

Respondent does not dispute that *Grunewald* remains binding Supreme Court precedent. Instead, it argues that the "central criminal purposes" of any 2020 election conspiracy are unknown, and that *Grunewald* "serve[s] only as a reminder [of] how premature it is to attempt" to "defin[e] the objectives of the conspiracy" at the "outset of the grand jury investigation." Supp. Br. at 1–3. Respondent openly acknowledges that the subject of *this* investigation is "irregularities in the Fulton County 2020 election." Cross-Mot. at 3. Yet Respondent reads *Grunewald* to suggest that so long as the government avoids defining the "central criminal purpose[]" of the potential

13

crime, the statute of limitations never comes into play. To indulge the premise that the "central purpose" of a 2020 election conspiracy remains unknown, a court must accept the fiction that until an investigation is over, we have no way of knowing whether the statute of limitations has run on potential crimes, including offenses related to the 2000 election or, for that matter, the election of 1876. That cannot be correct. Respondent does not point to a single case suggesting that a court must suspend disbelief and allow a party to circumvent a statute-of-limitations issue through artful characterization of the "central purpose" of a crime, or by declining to characterize such a purpose.

Respondent's reliance on *Trump v. Vance*, 480 F. Supp. 3d 460 (S.D.N.Y. 2020), and *United States v. Doe*, 457 F.2d 895 (2d Cir. 1972), is misplaced. *See* Supp. Br. at 4–5. Those cases stand for the unremarkable proposition that in investigating a timely offense, the government may subpoena pertinent *documents* "from years outside of the specific time period during which a crime is thought to have been committed," including documents that predate the offense's statute of limitations. *Trump v. Vance*, 480 F. Supp. 3d at 496; *accord United States v. Doe*, 457 F.2d at 901. Therefore, even where the relevant statute of limitations is five years, the government could potentially subpoena six-year-old documents as part of an investigation into a timely offense. But that uncontroversial principle has no bearing on this motion to quash. Here, the fatal defect is that any *offense* being

14

investigated fell outside of the statute of limitations, not that the Subpoena seeks *documents* generated outside of the statute of limitations. *Trump* and *Doe* are thus entirely inapposite.

### b. The Possibility of Obstruction Does Not Indefinitely Extend the Statute of Limitations.

Recognizing that the binding precedent of *Grunewald* likely forecloses its initial argument for blowing past the five-year statute of limitations, Respondent attempts to bootstrap its way into timeliness with a new theory. It argues that the mere fact of an ongoing investigation gives rise to the possibility of criminal obstruction, which would itself be a timely offense. *See* Supp. Br. at 3–4. Respondent seems to believe that the potential for obstruction—which necessarily exists in every investigation—is a silver bullet that pierces through any statute of limitations bar. Under Respondent's boundless theory, there is nothing stopping the government from issuing subpoenas to investigate Iran-Contra, Watergate, or the Teapot Dome Scandal. In Respondent's view, the potential for criminal interference with these investigations would wipe away any statute-of-limitations problem. *See* Supp. Br. at 3–4. Respondent thus asks this Court to adopt a rule that would invite future administrations to subject their political rivals to probes into decades-old controversies. That cannot be what Rule 17's "reasonableness" test allows.

### c. The Purported Post-2020 Alteration of Ballot Images Does Not Give Rise to a Prosecutable Criminal Offense.

The only supposedly timely conduct Respondent identifies is the alleged post-2020 alteration of ballot images. *See* Supp. Br. at 3. But this conduct (1) is inaccurately described, (2) would not be a crime, and (3) has nothing to do with the information sought by this Subpoena. In arguing that a hypothetical prosecution could be timely, Respondent points to "evidence in the probable cause affidavit" submitted in *Pitts v. United States*, Civil Action No. 1:26-CV-00809-JPB (N.D. Ga. May 6, 2026) (hereinafter, "*Pitts*") that "ballot image files bore indications of being altered as recently as January 2024." *See* Supp. Br. at 3; *see also* Petitioner's Ex. 4, Search Warrant Affidavit [Doc. 17-5] ("Affidavit"). And Respondent asserts that Judge Boulee "pointed out" this fact in *Pitts*. Supp. Br. at 3.

Respondent fails to mention, however, that Judge Boulee "pointed out" these allegations in the context of emphasizing the Affidavit's *defects*. *See Pitts*, slip op. at 36–37. Judge Boulee characterized the Affidavit's description of these events as "troubling," noting that the government "failed to explain that this [January 2024] modification date could have been caused by personnel from the Secretary of State's Office simply renaming the file." *Id.* at 37.

Moreover, even if the ballot images from the 2020 election were somehow altered in January 2024, Respondent cites no authority suggesting that this conduct would be criminal. The only relevant records retention statute, 52 U.S.C. § 20701,

16

makes it a misdemeanor to modify records within *22 months* of the election. Any modification of ballot images in January 2024 occurred long after the final date on which it would have been unlawful to modify such records.

Puzzlingly, Respondent relies on the Affidavit's purported recitation of "the unexplained disappearance of hundreds of thousands of ballot images," which "may have been destroyed when tabulator data cards were *repurposed* for use for the 2022 election." Supp. Br. at 3 (emphasis added). But that depiction of the Affidavit is wrong in multiple ways. The Affidavit never describes the "unexplained disappearance" of "hundreds of thousands" of ballot images. *See generally* Affidavit. Nor does it raise the possibility that tabulator cards "were repurposed" in 2022, as the Affidavit does not discuss the 2022 election at all. *See generally id.* Instead, the Affidavit recites a witness's allegation that "there were 17,852 missing ballot images" from the Georgia Secretary of State's website.[2] Affidavit ¶ 14. This witness's theory, however, is that 17,852 votes without corresponding ballot images were tallied during the *2020 election recount*, not that 17,852 ballot images existed but then mysteriously "disappeared" in 2022 or at any point after the 2020 election. *See id.* None of the Affidavit's witnesses so much as hypothesize about potential

---

[2] Notably, there is no explanation in the Affidavit or any of Respondent's briefing as to why Fulton County election workers would have any knowledge of the records maintained and provided by the Georgia Secretary of State's Office through its website.

wrongdoing in 2022 that would resuscitate the possibility of a prosecution within the statute of limitations.

Moreover, even if the Affidavit contained an allegation that ballot images were "destroyed when tabulator cards were repurposed for use for the 2022 election," Supp. Br. at 3, which it does not, this incidental occurrence would not amount to a crime. 52 U.S.C. § 20701 penalizes only "willful[]" destruction of records. The Affidavit does not come close to speculating that tabulator cards were repurposed in 2022 in order to intentionally destroy evidence of improprieties from 2020. Respondent claims that its need for the requested documents "is sufficiently clear from the probable cause affidavit," Cross-Mot. at 3, but it mischaracterizes the allegations in that Affidavit and invents unsupported new theories of wrongdoing out of whole cloth.

Further, none of the alleged post-2020 conduct described in the Affidavit is remotely related to the individuals whose sensitive personal information this Subpoena seeks. Because that alleged conduct concerns only the potential actions of individuals at the Georgia Secretary of State's Office, that conduct offers no justification for enforcing this Subpoena, which seeks information about poll workers and not Secretary of State officials. The ballot-images allegation repeated in the Affidavit is that the Georgia Secretary of State's Office provided a witness with two flash drives containing files with ballot images, and that one of those files

18

was modified on January 11, 2024. *See* Affidavit ¶ 22. Setting aside the numerous other defects with this allegation, it has nothing to do with the election workers swept up in this Subpoena. There is no nexus between (a) this Subpoena, which targets thousands of 2020 election workers from Fulton County, and (b) conduct by the *Secretary of State's Office* that occurred well after the 2020 election. In short, Respondent's post-2020 allegations about ballot images cannot stave off the statute-of-limitations issue that undercuts Respondent's purported need for this information. The timely conduct that the Respondent supposedly identifies is mischaracterized, not criminal, and not related to this Subpoena's targets.

### III. The Record Shows That Enforcement of the Subpoena Would Deter Poll Worker Participation and Undermine Petitioner's Ability to Administer Elections.

Respondent does not dispute that enforcing this Subpoena will impose grave costs—namely, deterring individuals from participating in future elections as poll workers and undermining Petitioner's ability to administer elections.[3] Instead, Respondent solely contests whether the First Amendment applies to poll workers. That is wrong for the reasons explained below. But even if the Court rejects Petitioner's First Amendment argument, the Court should still quash the Subpoena because of the undue burden and cost that compliance would impose on Petitioner. *See* Fed. R. Crim. P. 17(c)(2).

---

[3] *See* Ghazal Decl.

Petitioner administers elections for the most populous county in Georgia, and it cannot function without a reliable supply of poll workers, volunteers, and temporary staff. Petitioner's Exhibit 11 establishes, without any challenge or contradiction, that the Subpoena threatens that supply of crucial election workers, who are needed to administer elections. Given these costs of compliance, the Subpoena is unreasonable under Rule 17 for this reason alone.

## IV. The Subpoena Burdens the First Amendment Associational Rights of Election Workers.

Though Petitioner need not establish a First Amendment violation to show that the Subpoena is unreasonable under Rule 17, Respondent is wrong that the First Amendment is inapplicable. The Subpoena raises serious First Amendment concerns that require quashal. Courts have recognized that "although a grand jury subpoena is presumed valid and enforceable, if the [subpoena recipient] demonstrates a legitimate First Amendment concern raised by the subpoena, then the government must make an additional showing that the grand jury actually needs the disputed information." *In re Grand Jury Subpoena to Amazon.com Dated August 7, 2006*, 246 F.R.D. 570, 572 (W.D. Wis. 2007); *see also In re Grand Jury Subpoena Issued to Twitter, Inc.*, No. 3:17-MC-40-M-BN, 2017 WL 9485553, at *4 (N.D. Tex. Nov. 7, 2017) (collecting cases). And the Eleventh Circuit in particular has required the government to meet a higher burden of scrutiny where a subpoena implicates First Amendment rights. *See In re Grand Jury Proceeding*, 842 F.2d 1229, 1233–35 (11th

20

Cir. 1988) (citing *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963)). These decisions establish that if a grand jury subpoena impairs the exercise of the First Amendment right to expressive association, the government must show (1) the subpoena serves a compelling state interest, and (2) the requested evidence is *substantially related* to this compelling state interest. *E.g.*, *In re Grand Jury Proceeding*, 842 F.2d at 1233.

This heightened standard applies to the Subpoena, which attempts to compel the disclosure of the expressive associational activities of every single election worker in Fulton County. There is no disputing that the "previous disclosure of the identity" of election workers has exposed those workers to "actual and threatened reprisal." *Id.* at 1235. As one 2020 election worker explained, she received "hundreds of racist, threatening, horrible calls and messages" after her identity was disclosed. Mot. to Quash at 11. The First Amendment protects not just political or ideological association but *any* association whose disclosure would chill constitutionally protected activity. "[I]t is immaterial to the level of scrutiny whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters. Regardless of the type of association, compelled disclosure requirements are reviewed under *exacting scrutiny*." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) (emphasis added) (citations and quotation marks omitted). Poll workers, including volunteers, engage in acts of

21

civic expression and participate in the process of democratic self-governance. *See* Petitioner's Ex. 11. They need not be partisan to have constitutional protection surrounding their activities; the act of administering a free and fair election is itself an expression of democratic participation. These protected associational rights are directly impaired here because compelled disclosure of personal information—home addresses, personal phone numbers, and personal emails—to the federal government constitutes a First Amendment harm, regardless of whether the government promises to keep the list secret. *See First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1130–31 (2026) (citing *Bonta*, 594 U.S. at 615–16).[4]

Respondent principally argues that working for a public election authority can never implicate constitutionally protected "private expressive association" under the First Amendment, and that no case has directly so held. Cross-Mot. at 10. But Respondent does not identify any case that has held to the contrary, either, and Respondent cannot cite a single instance of the U.S. Department of Justice seeking

---

[4] At the hearing, the Court inquired about the applicability of the principles established in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), a case holding that public employees do not retain First Amendment protection for speech made pursuant to their official duties. That case has no application to the First Amendment associational claims here. Petitioner is not asserting that election workers have a right to speak freely about their election work free from employer discipline. Instead, Petitioner asserts that their personal identifying information cannot be extracted by federal subpoena and delivered to law enforcement in a criminal investigation targeting them. *Garcetti* speaks to the conditions of public employment; it says nothing about whether the federal government can extract sensitive associational information through a grand jury subpoena.

such an enormous swath of personal data belonging to election workers. So, the absence of direct precedent is unsurprising; it says more about the unprecedented nature of what Respondent has done here than about the legal basis for Petitioner's First Amendment argument.

Respondent also ignores key factual differences between poll workers and run-of-the-mill government employees, including that poll workers participate in elections as a form of political expressive association and not purely as a means of traditional employment. And even if parts of a poll worker's job are non-expressive, that alone does not deprive a poll worker of First Amendment associational protection. *See In re Grand Jury Proceeding*, 842 F.2d at 1235 (explaining that organizations can have multiple purposes and still retain associational protection under the First Amendment); *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (emphasizing that public employees do not forfeit all First Amendment rights to free association).

Respondent also suggests in passing that the First Amendment cannot apply because the information sought could be obtained through the Georgia Open Records Act. Not so. The Georgia Open Records Act expressly exempts from public disclosure a public employee's "home address, home telephone number, personal mobile or wireless telephone number." O.C.G.A. § 50-18-72(a)(21). That is precisely the information the Subpoena demands. The legislature's separate

23

provision allowing disclosure of that exempt information to a grand jury upon written request, *id.* § 50-18-77, does not render it "public"—it confirms that the legislature recognized the sensitivity of this data and deliberately limited its disclosure to specific, controlled circumstances. Respondent's invocation of the Open Records Act thus cuts against its position: Georgia law treats this information as sensitive enough to withhold from the general public.

In sum, the Subpoena raises legitimate, non-speculative First Amendment concerns sufficient to require the government to meet a higher level of scrutiny. Respondent has failed to show that the Subpoena passes that test. Moreover, even if the Court rejects Petitioner's First Amendment argument, the Court should still quash the Subpoena because of the uncontested burden and cost that the Subpoena's chilling effect would impose.

## V.    Conclusion.

For the foregoing reasons, Petitioner Fulton County Board of Registration and Elections requests that the Court quash Grand Jury Subpoena 2026R00350-01.

Respectfully submitted, this 11th day of June, 2026.

/s/ Y. Soo Jo

Y. Soo Jo
Georgia Bar No. 385817
OFFICE OF THE FULTON
COUNTY ATTORNEY
141 Pryor St. SW, Suite 4038
Atlanta, Georgia 30303
Tel.: (404) 612-0246
soo.jo@fultoncountyga.gov

/s/ Kamal Ghali

Kamal Ghali
Georgia Bar No. 805055
Matthew A. Josephson
Georgia Bar No. 367216
Michael C. Duffey
Georgia Bar No. 710738
CHAIKEN GHALI LLP
One Atlantic Center
1201 W. Peachtree St. NW, Suite 2300
Atlanta, Georgia 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com
mjosephson@chaikenghali.com
mduffey@chaikenghali.com

/s/ Abbe David Lowell

Abbe David Lowell*
John Bolen*
LOWELL & ASSOCIATES, PLLC
1250 H Street NW
Washington, D.C. 20005
Tel.: (202) 964-6110
jbolen@lowellandassociates.com
alowellpublicoutreach@lowellandass
ociates.com

/s/ Stephen Jonas

Stephen Jonas*
Norman Eisen*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 1580
Washington, D.C. 20003
Tel.: (202) 594-9958
steve@democracydefenders.org
norman@democracydefenders.org

*Counsel for Fulton County Board of Registration and Elections*

*Admitted pro hac vice*

25

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record. Pursuant to LR 5.1(C) and 7.1(D), I prepared the brief using Times New Roman 14 point font.

This 11th day of June, 2026.

/s/ *Kamal Ghali*
Kamal Ghali